2022 IL App (2d) 200784-U
No. 2-20-0784
Order filed July 28, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-366 |
| KEVIN DEBOLT, | ) ) | Honorable Jody Gleason, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Jorgensen and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's conviction was supported by the evidence. Doctrine of invited error or acquiescence barred consideration of certain issues raised on appeal, but trial counsel did not provide ineffective assistance with regard to those or other issues identified by defendant. The trial court did not err in barring certain DNA evidence.

¶ 2   In December 2019, a jury convicted the defendant, Kevin DeBolt, of one count of criminal sexual assault of someone who was unable to give knowing consent to sexual penetration (720 ILCS 5/11-1.20(a)(2) (West 2016)). He was sentenced to seven years' imprisonment. He appeals, raising multiple issues. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    The State initially charged the defendant with two counts of aggravated criminal sexual assault alleging bodily harm (counts 1 and 2), and two counts of criminal sexual assault against a victim whom he knew was unable to give knowing consent (count 3) or unable to understand the nature of the act (count 4).  The State ultimately dismissed the counts of aggravated criminal sexual assault before trial and proceeded only on counts 3 and 4.  The trial took place over four days and included two days of jury deliberations.

¶ 5    The victim, A.P., lived in a two-bedroom condominium with her two daughters, 4-year-old A.V. and 13-year-old A.Z.  On August 10, 2015, A.P. attended a cookout at the house of her neighbor, Tara Newcomer, where she met the defendant for the first time.  It was undisputed that A.P. and the defendant had sex that included sexual penetration that night.  The primary issue at trial was whether the defendant knew or should have known that A.P. was unable to consent to the sexual penetration or to understand the nature of that act.

¶ 6    A.P. testified that she had five or six alcoholic drinks at Newcomer's over the course of four to six hours, including a beer, a glass of wine, a vodka cocktail, and several shots of liquor. At some point she vomited, and she felt sick and nauseous.  She walked back home with her older daughter, A.Z., and lay down in bed for a while.  She began to feel nauseous and got up to go to the bathroom.  She vomited, getting vomit on her clothes.  She showered in her clothes, continuing to vomit.  A.Z. was in and out of the bathroom with her, leaving to get clean clothes.  She testified that at one point the defendant entered the bathroom and got into the shower with her while still clothed, twice telling her to suck his dick.  However, no sexual penetration or oral sex occurred, and the defendant left the bathroom.

¶ 7    After she finished showering, A.P. got into a T-shirt and shorts and went to bed.  She went to sleep alone.  The next thing she recalled was waking at 6 a.m., naked, with both her younger

daughter A.V. and the defendant in bed with her. She did not recall inviting the defendant into her bed, did not know why he was there, and was scared. Leaving the defendant in bed, she took A.V. into the living room and woke up her older daughter, then began getting ready for work. She showered without washing the inside of her vagina and then put on a clean pair of underwear and clean clothes. A.P. had a conversation with her daughter that made her concerned that something had happened that she was not aware of. She was also very sore in her vaginal area. She did not see the defendant until she and her daughters were outside. He asked her for a ride. She did not know what to do and felt scared. She drove him to his mother's house.

¶ 8    A.P. felt sick and vomited throughout that day; she did not know why. However, she worked a full day. After work she went to the hospital, where registered nurse Lisa Thiltgen administered a rape kit. Thiltgen took DNA samples from A.P.'s mouth, vaginal area, anal area, and underwear, and took her clothing as well. No drugs were detected in A.P.'s system. DNA testing of the underwear revealed two DNA sources, the defendant's DNA and that of someone else who was unknown. The parties stipulated that the defendant sexually penetrated A.P. A.P. testified that she did not give the defendant consent to penetrate her or agree to have sexual relations of any kind.

¶ 9    The fact that A.P.'s underwear contained DNA from someone other than the defendant was the subject of repeated motions *in limine* by the defense prior to trial. The State argued that evidence about the second DNA was barred by the rape shield law, section 115-7 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7 (West 2014)). During the hearings on the motions *in limine*, the trial court held that the evidence regarding the second DNA would be admissible as a defense on the first two counts, to show that the alleged bodily harm (the vaginal soreness A.P. reported) could have been caused by someone else. However, it was not relevant to

the issues on counts 3 and 4. Once the State dismissed counts 1 and 2, the trial court barred the evidence from being mentioned. After A.P. testified on direct examination, defense counsel renewed the motion, arguing that A.P.'s testimony about her vaginal soreness opened the door to admission of the other-DNA evidence to show that someone else could have caused the soreness. The trial court agreed that the testimony opened the door, but only permitted defense counsel to ask A.P. whether she had had sex with anyone else that night. Defense counsel was required to accept whatever answer was given without introducing the DNA evidence. A.P. testified that she did not remember how many people she had sex with that night; she did not remember having sex with anyone that night. She did not recall any males other than the defendant coming to her house that night.

¶ 10    On cross-examination, A.P. admitted that her memory of that night was unclear. She told the police that she did not remember anything after her older daughter came to check on her at the party and she went back home, but she did tell them about the defendant coming into the bathroom when she was showering. She also told them that, although she did not remember vomiting, when she looked in her trashcan she saw vomit. A.P. stated that, after she gave the police a statement that first night, she remembered more. However, she did not remember Newcomer coming to her house to check on her. She did not remember leaving her bedroom after taking a shower and going to bed. She did not recall returning to the party after vomiting and sitting next to the defendant or smoking marijuana on Newcomer's porch.

¶ 11    A.P. did recall laughing and talking with the defendant in Newcomer's kitchen while she made herself a drink. They spoke for about 30 minutes, during which the defendant told her that he had been charged for "fighting an officer" and "resisting arrest," and he showed her pictures of the incident on his phone. Defense counsel then asked whether the defendant had told A.P. that

he was arrested. During a sidebar in which the trial court asked defense counsel why she had brought out the possibility of the defendant's arrest, defense counsel said that she would introduce evidence that the defendant was never arrested for that, and perhaps A.P. was confusing the defendant with someone else at the party. However, the defense never actually introduced such evidence.

¶ 12    A.P. testified that the defendant did not give her drinks or try to get her intoxicated. She invited him to walk back to her house with her to check on her daughters, and she was walking and talking normally at that point. Later in her testimony, A.P. recalled that this happened earlier in the evening, albeit after dark. She recalled that, when she vomited in the shower, the defendant was also in the shower. She remembered him leaving her house after that.

¶ 13    A.P. testified that, when she woke up the morning after the party, she went to Newcomer's house to look for her phone. She had a conversation there with Louis Galante, who she initially thought had been the person in her bed when she woke up. Galante said that it was not him, and A.P. asked him if he knew who it was. After she spoke with police, they came to her house and collected bed linens and clothing, including a gray men's shirt. When she drove the defendant to his mother's home that morning, he was fully clothed.

¶ 14    Defense counsel began to ask A.P. about whether she was concerned that her daughter would tell her father that A.P. and her four-year old daughter had woken up in bed with a strange man. The State objected, as this topic had been the subject of a motion *in limine* to bar evidence of A.P.'s child custody proceedings. Defense counsel was ultimately permitted to ask the question. A.P. answered that she herself had told her daughter's father the night she spoke with the police. Defense was not permitted to inquire further about that.

¶ 15    A.P. was confronted by inconsistent statements she had made in filing a petition for a no-contact order against the defendant.  She admitted that, although she'd said in the petition that the defendant walked her home about midnight, she had no idea if or when he had done that.  She also admitted that, contrary to her statements in the petition, she did not tell the defendant that she had no romantic interest in him.

¶ 16    The State called witnesses who testified about collecting and testing the DNA, and finding DNA consistent with the defendant's DNA on A.P.'s underwear.  The State then rested its case.

¶ 17    Before beginning its case, the defense renewed its motion to admit evidence of the second DNA, and moved for the limited admission (following an *in camera* inspection) of certain files from an earlier DCFS investigation.  It also moved for a directed verdict.  The trial court denied all of the motions.

¶ 18    Outside the presence of the jury, the parties discussed with the court the possibility of calling A.V., A.P.'s younger daughter who had been four years old at the time, as a witness.  A.V., who was eight by the time of trial, had stated that she did not remember anything about the evening.  The defense then sought to admit part of A.V.'s videotaped statement made shortly after the incident, in which A.V. stated that A.P. went to bed wearing only a towel, to impeach A.P.'s testimony that she was wearing pajamas when she went to bed.  The State objected, arguing that if that testimony came in then other relevant testimony should also come in.  Both parties recognized that portions of the statement were inadmissible.  The parties ultimately stipulated that A.V. had been four years old, she had made a statement at the Child Advocacy Center, and part of that statement would be played for the jury.  Defense counsel identified the portion of the video from 25:48 to 26:18 as the relevant portion.  That portion was played to the jury and was admitted into evidence.  In it, A.V. told the interviewer that A.P. was naked when she got out of the shower

and that she was "sort of" naked in the bed as she "had a towel on." The portion admitted into evidence did not include A.V.'s statement that A.P. "didn't put her jammies on" when she got into bed.

¶ 19    The defense then called to the stand Newcomer, whose cookout A.P. attended. She testified that A.P. arrived before 7 or 8 p.m. with a bottle of Fireball. Newcomer observed A.P. drinking heavily and smoking marijuana. Shortly after the incident, she described A.P. to police as "pretty well intoxicated" that evening. However, closer to trial, she stated that A.P. was coherent, walking and talking normally, throughout the evening. She saw A.P. talking and laughing with the defendant. She also saw A.P. leave the party several times' and at least once, the defendant was with her. However, the defendant came back alone soon afterwards. She did not recall the last time she saw A.P. that night. She was intoxicated that night and it affected her memory.

¶ 20    Newcomer went to A.P.'s house to check on her more than once. The first time she went, A.P.'s older daughter A.Z. told her that A.P. was in the shower. A.Z. told her that A.P. had vomited. Newcomer recalled that the defendant was at Newcomer's house at that point. The second time, she saw A.P. in the kitchen. At the end of the night, she, Galante, and the defendant were the only people left at her house. Galante was asleep and the defendant sat at the counter while she cleaned up the kitchen. After she finished cleaning, she went to A.P.'s house again and saw A.P. and the defendant in bed sleeping together. She turned on the light, but they did not react or wake. When she spoke with the police, she described them as "passed out."

¶ 21    Newcomer testified that between 7 and 9 p.m. the defendant came into her house wearing only a towel because his clothes had gotten wet, and she loaned him boxer shorts to wear. He put his clothes back on at some point. Newcomer admitted that she did not tell the police this; the first

time she told anyone was when she spoke with the defense attorneys. That was also the first time she told anyone about A.P. smoking marijuana. Before that she was worried about getting A.P. in trouble.

¶ 22    The defendant then testified. He stated that his friend Galante had driven him to Newcomer's house because he did not have a license. They began drinking, and he had about three drinks before dinner. A.P. arrived within one or two hours of when he arrived. At some point, she was handing out shots of Fireball. The defendant found A.P. easy to talk to and mostly talked to her and Galante during the party.

¶ 23    A.P. invited him to go with her to her home to check on her daughters. The defendant went with her and waited outside. Not long after, they walked back to the party and A.P. asked the defendant for his number. They hung out together for the rest of the night. The defendant never saw A.P. behaving incoherently, struggling to walk, vomiting, or slurring her speech. A.P. left a couple more times to check on her daughters. Once, one of her daughters came over to the party and asked her to come home. Another time, A.P. was gone for a while, but she was in the same clothes when she returned and did not seem to have showered.

¶ 24    Later, A.P. invited him back to her apartment, saying that it was all right for him to stay at her place and that she could give him a ride home in the morning. At her home, the lights were off and the children were asleep, the younger one in A.P.'s bed and the older one in her own room. The defendant testified that A.P. then insisted that they go into the bathroom and, once there, took his pants off and performed oral sex on him. They then removed the rest of their clothing and had sex in the shower, during which he ejaculated into her vagina. He did not ask or tell her to undress, kiss, or have sex, she just did so. His clothes got soaked during the sex because the shower curtain

was open and water hit the clothes on the floor. The defendant then walked back to Newcomer's house in a towel, where Newcomer gave him boxers and pajama pants.

¶ 25 A.P. had asked him to wait 10 or 15 minutes to put her kids back to bed before he returned, so he waited at Newcomer's, talking to her as she cleaned up. He then gathered his things and walked back to A.P.'s house. A.P. was coming from the kitchen, still wearing her towel. She did not ask him to leave. He and A.P. went to sleep in her bed. They did not have sex again because A.P. told him she was afraid her children would walk in on them. A.P. told him that she had to work early the next morning, and he said he needed to catch an early train to Chicago.

¶ 26 The next morning, he woke up alone in A.P.'s bed. He was sure they did not have sex in A.P.'s bed. A.P. was rushing to get ready but did not seem upset. She could not find her phone at her house, so they drove to Newcomer's house to look for it. A.P. then drove him to his mother's house.

¶ 27 On cross-examination, the defendant testified that A.P. did not tell him in words that she wanted to have sex, but she pulled him into the bathroom and kissing him, which indicated that she wanted to have sex. They had not discussed having sex before then. Asked if he had discussed birth control with her, the defendant asked, "Why would I do that?"

¶ 28 Although A.P. had been drinking, she was not intoxicated to the point that she was falling over herself, crawling on the ground, or in need of someone to carry her home. He did not see her vomit and never heard from anyone that she had vomited. In the morning, he got his clothes from the bathroom floor; they had dried enough for him to put them back on for the short drive to his mother's house. Anticipating the State's rebuttal evidence, he denied that he ever came to A.P.'s house to look for an envelope or paperwork, or helped A.P. into the shower when she was vomiting.

¶ 29    The State began its rebuttal by putting the defendant's four prior criminal convictions into evidence: two 2014 burglary convictions, a 2017 aggravated battery conviction, and a 2018 conviction of criminal damage to government-supported property. It then called A.P.'s older daughter, A.Z., to the stand. A.Z. identified the defendant as the man she had seen in her home in August 2015.

¶ 30    A.Z. testified that on the night of the party she went to get her mother from Newcomer's house and brought her mother home to bed. She then saw her mother get out of bed and throw up in the hallway and the bathroom. The defendant was in the doorway, having come over to check on A.P. The defendant helped her bring A.P. to the bathroom so she could finish vomiting, and then he left. After that, Newcomer and Galante came and briefly helped her mother while she was vomiting. A.Z. helped her mother take off her clothes to shower and then went to play video games. When A.P. was finished showering, A.Z. brought her pajamas and A.P. got dressed. A.P. got back into bed but did not stay there; she got up and went into the kitchen. She later went back to bed. A.Z. saw her mother, wearing pajamas, get into bed with A.V., who had fallen asleep in her mother's bed.

¶ 31    A.Z. saw the defendant again. He came back to A.P.'s house because he had forgotten his drink and an envelope. He waited at the door while A.Z. got them and gave them to him, and then left. A.Z. played video games for another 20 minutes or so and then went to bed in her room, across the hall from her mother's bedroom. She had no idea what her mother did after that. The next time she saw the defendant was the next morning, in her living room. He came out of her mother's bedroom wearing pajama pants. That morning, she told her mother that she had vomited the night before.

¶ 32    At trial, A.Z. testified that, after the defendant left the first time and before he came back for the drink and envelope, she saw him leave the bathroom in wet clothes.  Cross-examination established (1) that A.Z. first had this memory, which she had never told anyone before, after her mother read her a statement shortly before trial, and (2) that although A.Z. had assumed it was an earlier statement of her own that her mother read, in fact it was the statement of her little sister, A.V.  Nevertheless, A.Z. asserted that hearing the report about wet clothing had reminded her that she herself had seen the defendant leaving the bathroom in wet clothes. She also testified that she heard her mother say "get out!" to the defendant in the bathroom.

¶ 33    At the jury instruction conference, defense counsel asked that Illinois Pattern Jury Instruction, Criminal, No. 11.63 (4th ed. 2000) ("IPI Criminal 4th") be given: "It is a defense to the charge of sexual assault that [A.P.] consented."  Defense counsel also asked that IPI Criminal 4th No. 11.63A, which defines "consent," be given: "The word 'consent' means a freely given agreement to the act of sexual penetration in question.  Lack of physical or verbal resistance or submission by the victim resulting from the use of force or threat of force by the defendant shall not constitute consent."  The State tendered the same definition of consent but modified it to include only the first sentence.  The defense agreed with the shorter version and withdrew its own version.

¶ 34    The elements instruction for count 3 required the jury to find two propositions: that the defendant committed an act of sexual penetration of A.P., and that the defendant knew that A.P. was unable to give knowing consent to the act.  Defense counsel objected to this instruction, preferring a disjunctive instruction.  The trial court gave the instruction over objection.

¶ 35    A few minutes before 7 p.m., after closing arguments and instructions, the jury retired to deliberate.  While deliberating, the jury sent out several notes.  The first asked for clarification of

what "that the defendant knew that A.P. was unable to understand the nature of the act" meant. Over objection by the defense, the trial court responded that the jury had "been given the law applicable to the case." At 9:21 p.m., the jury sent out another note, asking for a transcript of A.P.'s testimony relating to her level of intoxication. The court responded that a transcript would not be available until late the next morning, to which the jury replied that they would not need the transcript.

¶ 36 At 11:05 p.m., the jury sent out a note saying that they were deadlocked and no one was willing to change their position. The note also gave a breakdown of the current votes, which included three for guilty, eight for not guilty, and one "no verdict" on each count. The trial court read the note about deadlock to counsel. The court also told them the jury had listed the current votes, but did not tell counsel what those votes were. The court and counsel then conferred on the best response:

"THE COURT: So do you want me to bring them out and give them the instruction that your verdict must be unanimous, you should continue to deliberate, or are you asking for a *Prim* [instruction] at this time?

MR. WEIS [ASSISTANT STATE'S ATTORNEY]: Judge, I don't think with a four-day and four hours of deliberation that *Prim* is anywhere close to that at this point.

THE COURT: Right. It's not very long.

MR. WEIS: Obviously with the time of day, I guess is the bigger issue, it's a little after 11:00 in the evening.

MR. MOTTA [DEFENSE ATTORNEY]: It's a very long day.

MR. WEIS: I probably would want to, one, either have the court just make the decision or request if they want to come back tomorrow because it's 11:00. At some point--

THE COURT: I totally get that. So would you suggest that I write your verdict must be unanimous. You should continue to deliberate further in an effort to reach a verdict based upon the evidence and testimony presented during the trial. Would you like to continue to deliberate tonight or return tomorrow morning?

MR. WEIS: I'm fine with that, judge. Like I said, with the hour I start getting a little worried too.

THE COURT: Right. It's late.

MR. MOTTA: You see what the numbers are so, I mean, I'm not asking what they are. I think they need to sleep. It's been a 12-hour day.

THE COURT: Well, I think we need to ask them what they want to do * * * because I think if you tell them that, go home, just go home and come back tomorrow, that may make people much angrier than giving them the choice do they want to continue to deliberate tonight.

MR. MOTTA: Defer to you.

THE COURT: Okay. So this is the answer:

Your verdicts must be· unanimous. You should continue to deliberate further in an effort to reach a verdict based upon the evidence and testimony presented during the trial. Do you want to continue tonight or come back tomorrow? Please advise."

The trial court sent back a response with that language. The jury replied with a note saying that they would come back tomorrow. They wanted to see the transcripts of the testimony by A.P. and Thiltgen (the emergency room nurse), along with the nurse's report, because they were "hung up on the level of" A.P.'s intoxication.

¶ 37 The jury returned to the courthouse and its deliberations about 9 a.m. the next day. Soon afterwards, they sent out a note asking about the transcripts, to which the court responded that the testimony was being transcribed but it might take several hours to complete. The court asked that the jurors continue to deliberate in the meantime.

¶ 38 The jury then asked to see the exhibits. The State did not think that any of its exhibits (such as the rape kit and clothing) should go back to the jury room. The defense asked to send in a recording of the excerpt of A.V.'s statement that had been played for the jury. At that point, defense counsel discovered that the excerpt began at 25:48 and ended at 26:18, not 27:18 as she had wanted, and thus did not include A.V.'s statement that her mother "didn't put on jammies" when she got into bed. The court reporter confirmed that the attorney had specified that the excerpt should end at 26:18, and the trial court listened to the entire portion that defense had wanted played and made a factual finding that the extra minute had not been played to the jury earlier. Hence, the extra minute was not in evidence.

¶ 39 Defense counsel asked that the trial court reopen the proofs so that the extra minute could be admitted. The State objected, arguing that reopening proofs when the jury had already begun to deliberate was improper. The trial court denied the request. It responded to the jurors' note asking for exhibits by sending in the DNA experts' resumes and a tape recorder with a recording of the admitted portion of A.V.'s statement, and saying, "Exhibits 3 and 4 are available. The scientific exhibits do not come back. Exhibit 4A [the recording] is in the recorder."

¶ 40 A little after noon, the jury asked for the "original statements" of A.P., A.Z., A.V., and Newcomer. The parties and the court discussed whether this meant transcripts of testimony or out-of-court statements (to the police, for example) that had not been admitted into evidence. The court ultimately responded that the jury already had all the exhibits that were available. The jury

then asked about the status of the transcripts, and the trial court responded that the transcripts would be provided as soon as they were ready. The transcripts eventually were completed and were given to the jury.

¶ 41    At some point in the afternoon, the jury returned its verdict. It acquitted the defendant of count 4, the "unable to understand the nature of the act" charge, but convicted him of count 3, which charged him with sexually penetrating A.P. while knowing that she was unable to knowingly consent to that penetration. The jury was polled and each juror affirmed his or her verdict. The jury was then dismissed.

¶ 42    The defendant filed a post-trial motion, arguing among other things[1] that the verified statement of one of the jurors raised a question of improper influence from the jurors' independent observations, and that there was "newly discovered evidence" of phone calls made from the defendant's phone to A.P.'s phone that "contradicted" A.P.'s testimony in an unexplained way. The trial court denied the motion. This appeal followed.

¶ 43                           II. ANALYSIS

---

[1] The post-trial motion also alleged prosecutorial error: that through body language and gestures, the prosecutor improperly "directed" the State's rebuttal witness, A.Z., in her in-court identification of the defendant. An evidentiary hearing on this allegation was held before a different judge, who found that no error was proved. At the defendant's request, the trial judge also reviewed that finding and considered whether to review the video from the courtroom security cameras. The trial judge found no error and denied the request to view the security footage. While noting these events in his brief, on appeal the defendant raises no argument regarding these rulings.

¶ 44    On appeal, the defendant argues that (1) the State did not prove him guilty beyond a reasonable doubt; (2) the trial court erred in giving jury instructions stating that consent was a defense and defining consent; (3) the trial court erred in its responses to the jury note regarding "deadlock"; (4) defense counsel rendered unconstitutionally ineffective assistance in failing to object to the trial court's actions with respect to the last two issues, and also in other ways; (5) the trial court's evidentiary rulings regarding the other DNA denied him a fair trial; and (6) the trial court erred in failing to conduct an evidentiary hearing on the juror's statement submitted after trial.[2]

---

[2] The defendant also initially argued that the trial court erred in refusing to admit records of an investigation of A.P. by the Department of Children and Family Services (DCFS) because the records could show a motive for A.P. to have denied consenting to sex with a stranger. (The trial court denied the motion after learning that the investigation was not opened until after A.P. reported the assault, and it was ultimately unfounded.) Because the DCFS records had never been admitted into evidence and were not part of the record, the State filed a motion to strike, asking us to strike this argument and also to strike or disregard portions of the defendant's statement of facts that it characterized as overly argumentative. The defendant then moved this court to admit the records and supplement the record on appeal. We denied the defendant's motion to supplement, and the defendant thereafter withdrew the argument.

We took the State's motion to strike with the case and now deny the motion on the ground that, as to the DCFS-records argument, it is moot because that argument is not before us now, and, as to the "argumentative" portions of the statement of facts, we do not find that they run afoul of the Supreme Court rules.

¶ 45                    A. Insufficient Evidence of Guilt

¶ 46    The defendant first argues that the State did not prove him guilty beyond a reasonable doubt, because A.P.'s testimony was improbable, impeached, and contradicted by other evidence. We find this argument unpersuasive.

>       "When considering a challenge to the sufficiency of the evidence in a criminal case, our function is not to retry the defendant. [Citation.] Rather, our inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. [Citation.] This means that we must allow all reasonable inferences from the record in favor of the prosecution. [Citation.] 'We will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt.' " *People v. Lloyd*, 2013 IL 113510, ¶ 42 (quoting *People v. Collins*, 214 Ill. 2d 206, 217 (2005)).

As we cannot reweigh the evidence, and there was sufficient evidence in the record to support the jury's verdict, we will not set that verdict aside.

¶ 47    The defendant attacks A.P.'s credibility by asserting that, although she professed to remember nothing after taking a shower, getting dressed in sleep clothes, and getting into bed, witnesses saw her "awake and coherent" after that. This is a misstatement of the record. A.Z. testified only that her mother got up and walked into different rooms in the house, ineffectually looking for certain items in the kitchen and elsewhere, not that she was "coherent" or even particularly "awake." Newcomer testified that A.P. left the party several times and returned, but she could not recall what time she last saw A.P., so the jury could reasonably infer that all of those entrances and exits happened before A.P. went home with her daughter, vomited, and showered.

And although the defendant testified to an entirely different version of events, the jury was free to disbelieve him and believe A.P. instead. The weight to be given to the witnesses' testimony, the determination of their credibility, and the reasonable inferences to be drawn from the evidence are all matters within the jurisdiction of the trier of fact. *People v. Smith*, 185 Ill. 2d 532, 542 (1999); *Collins*, 106 Ill. 2d at 261-62. Likewise, the resolution of any conflicts or inconsistencies in the evidence is also within the province of the fact finder. *Collins*, 106 Ill. 2d at 261-62.

¶ 48     Similarly, the defendant argues that A.P.'s testimony that she vomited in the shower was not believable because she did not mention doing so in her initial statement to the police and only recalled it shortly before trial. However, the record shows that A.P. told the police that she vomited in the bathroom, admitting that she did not remember doing so but knew that she had because she saw the vomit in the bathroom trashcan. The defendant also asserts that A.P.'s testimony that she did not recall Newcomer coming to her house that night was contradicted by her statement to police, in which A.P. purportedly said that Newcomer and Galante helped her to the bathroom when she began feeling sick. However, the contents of A.P.'s statement to police are unknown, as that statement was never admitted into evidence and no testimony established its contents, and thus it did not impeach A.P. We note that Newcomer's own testimony supported A.P.'s testimony on this point, as it does not reflect that A.P. ever saw Newcomer on any of her visits.

¶ 49     The defendant also argues that it would be "contrary to common experience" for a person not to wake up during sex, but the jurors evidently found that that could occur if a person were intoxicated, and there is nothing outlandish about their conclusion.

¶ 50     Similarly, the defendant argues that A.P.'s report to the police (which she adhered to at trial) that the defendant entered the shower with his clothes on and told her to suck his dick while she was showering makes no sense and was not heard by A.Z. We agree that this testimony depicts

unusual and even illogical behavior by the defendant. However, certain aspects of it, such as the defendant's clothes getting wet, were corroborated by other witnesses including Newcomer. Moreover, the jury could reasonably have found that this memory was evidence of A.P.'s confused state at the time rather than an intent to lie. As the State argued in closing, if A.P. had decided to make up a lie about the defendant, it would have made sense for her to adopt a more clear-cut story of an attack. The jury could reasonably have concluded that this memory did not render the rest of A.P.'s testimony untrustworthy or unbelievable.

¶ 51    Finally, at trial A.P. admitted that certain statements she made in a verified petition for a no-contact order were either untrue or she did not know if they were true. A.P. explained that a court advocate had filled out the form for her and she did not know why the petition contained those statements. As we have noted, however, credibility determinations are the province of the jury, and it was fully capable of giving A.P.'s testimony the weight it felt that testimony deserved.

¶ 52    Further, other evidence supported the conclusion that the defendant knew that A.P. was unable to knowingly consent to sexual penetration. (This was the only real issue at trial, as the defendant conceded that he sexually penetrated A.P.) Testimony from multiple witnesses established that A.P. had had a half dozen drinks during the evening, including a glass of wine, beer, vodka and orange juice, and several shots, and that the defendant witnessed this. A.P.'s testimony that the defendant was present when she vomited was supported by A.Z., who testified that the defendant helped A.P. into the bathroom. Thus, the jury could infer that the defendant knew that A.P. was intoxicated and sick. Newcomer stated that, when she checked on A.P. for the last time and found the defendant in bed with her, they were both "passed out" and did not wake when she turned on the light. Coupled with A.P.'s inability to remember the events of the previous night when she woke, this was circumstantial evidence that A.P. had been substantially and

noticeably impaired by her intoxication. Drawing all reasonable inferences from the evidence in favor of the State, the evidence sufficiently supported the defendant's conviction.

¶ 53                                    B. Jury Instructions Regarding Consent

¶ 54    The defendant next claims that the trial court erred by instructing the jury that consent was a defense to the charged offenses and defining consent. The defendant concedes that this issue may fall under the doctrine of invited error, but argues that this should not be dispositive. The defendant's argument is unavailing.

¶ 55    The doctrine of invited error or acquiescence is that "a party cannot complain of error which that party induced the court to make or to which that party consented." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). As our supreme court has explained, "[t]he rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings." *Id*. (citing *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000) and *People v. Segoviano*, 189 Ill. 2d 228, 240-41 (2000)). Importantly, this type of waiver, which occurs through a defendant's affirmative act or active agreement, is different than a forfeiture that occurs when a defendant fails to bring an error to the trial court's attention, and is not subject to the plain error doctrine. *People v. Bowens*, 407 Ill. App. 3d 1094, 1101 (2011) (citing *People v. Townsell*, 209 Ill. 2d 543, 547-48 (2004)).

¶ 56    Here, the defendant tendered the jury instruction regarding consent being a defense, and both the defendant and the State tendered versions of the consent definition instruction, with the defendant then voluntarily withdrawing his own version in favor of the shorter version tendered by the State. Under these circumstances, the defendant may not argue on appeal that these instructions should not have been given. The defendant argues that he did object to another instruction that included a reference to consent—the elements instruction for the charged

offense—but that is a different instruction, and the record makes it clear that the defense objected for reasons unrelated to the defendant's contention that consent was a defense and his definition of consent. Accordingly, this claim of error cannot be heard on appeal.

¶ 57       C. Trial Court's Response to the Jury Note Regarding "Deadlock"

¶ 58    The defendant next complains that the trial court's response to the jury's 11 p.m. note saying that it was "deadlocked" was coercive and improper under *People v. Prim*, 53 Ill. 2d 62 (1972). The defendant has also waived this argument, by acquiescing in the trial court's response. "When a defendant acquiesces in the trial court's answer to a question from the jury, the defendant cannot later complain that the trial court's answer was an abuse of discretion." *People v. Averett*, 237 Ill. 2d 1, 23-24 (2010). As with the waiver described above, this type of waiver is not subject to the plain error doctrine. *Bowens*, 407 Ill. App. 3d at 1101.

¶ 59    Here, when the trial court described how it would answer the jury's note indicating that it was deadlocked, defense counsel offered no objection, nor did it suggest an alternative response. Instead, defense counsel agreed with the prosecutor's comment that it had been a long day and suggested that the jury needed to sleep. When the trial court reiterated its proposed response, defense counsel acquiesced, saying it would defer to the court. Once again, there was no objection or suggestion of a different response. On this record, we find that defense counsel clearly acquiesced in the trial court's response and cannot now challenge that response on appeal. *Averett*, 237 Ill. 2d at 23-24.

¶ 60       D. Ineffective Assistance of Counsel

¶ 61    Anticipating that we might find the previous two arguments waived under the doctrine of acquiescence or invited error, the defendant asserts in the alternative that his trial counsel's tendering of the jury instructions on consent and failure to object to the trial court's response to

the "deadlocked" note, along with various other of counsel's actions or omissions, constituted ineffective assistance of counsel. We disagree.

¶ 62    Under the two-prong test developed in *Strickland v. Washington*, 466 U.S. 668 (1984), to prevail on a claim of constitutionally ineffective assistance of counsel, "a defendant must show that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defendant in that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Houston*, 226 Ill. 2d 135, 144 (2007). Regarding the first prong, there is a strong presumption that counsel's actions or inactions—such as the decision not to present certain arguments, or not to call witnesses, including the client herself—constitute sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). To prove otherwise, a party must show that counsel's decision was so irrational and unreasonable that no reasonably effective attorney, facing like circumstances, would pursue such a strategy. *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82. Because a defendant must satisfy both prongs of the *Strickland* test, the failure to establish either is fatal to the claim. *Strickland*, 466 U.S. at 687.

¶ 63    The defendant first contends that his trial counsel's tendering of a defense-of-consent jury instruction (which was then given) and assent to the State's proposed instruction defining consent amounted to deficient representation that prejudiced him. We reject this argument, as the defendant cannot show either deficient performance or prejudice.

¶ 64    "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). The correctness of jury instructions "depends not on whether defense counsel can imagine a problematic meaning, but

whether ordinary persons acting as jurors would fail to understand them." *Id*. The operative standard in assessing possible prejudice from jury instructions is whether, taken as a whole, they clearly and correctly stated the law applicable to the case under the facts adduced at trial. See *id*. at 86. A defendant is entitled to have the jury instructed on his theory of the case if there is even slight evidence supporting it. *People v. Washington*, 2012 IL 110283, ¶ 43.

¶ 65    The defendant correctly observes that the committee comments to the defense-of-consent instruction state that it should be given only when the use or threat of force is alleged. See IPI Criminal 4th No. 11.63, Committee Notes; see also 720 ILCS 5/11-1.70(a) (West 2014). Here, of course, no use of force was alleged, and the focus was on whether the defendant knew that A.P. was unable to knowingly consent to the sexual penetration. Thus, giving the defense-of-consent instruction was not supported by the IPI, and the State had grounds to object (which it did not do). Nevertheless, in considering whether tendering the instruction was deficient performance by the defense attorney, we note that there was some strategic basis for tendering the instruction, as it reflected the defendant's theory of the case under which he and A.P. had consensual sex. And although the focus of the defense-of-consent instruction was on the complainant's actions rather than on the defendant's knowledge, the instruction was not inconsistent with the offense charged: if the jury found that A.P. did indeed voluntarily consent to sex with the defendant, they would be free to conclude that the defendant had no reason to know that she did not consent. Similarly, as to the definition instruction, the definition of consent was plainly relevant to the jury's deliberations. Thus, counsel's tendering and acquiescing in these instructions did not amount to deficient performance. *Washington*, 2012 IL 110283, ¶ 43. Further, when read together with the elements instruction, the jury instructions clearly and correctly stated the law applicable to the case. *Bannister*, 232 Ill. 2d at 86. Accordingly, the defendant cannot establish prejudice either.

¶ 66    The defendant next argues that his counsel's failure to object to the trial court's response to the jury note about "deadlock" constituted ineffective assistance.  He argues that the trial court's response was reversible error because it improperly coerced the jury into reaching a verdict, and therefore his counsel should have objected.

¶ 67    When a jury reports that it is deadlocked, a trial court may, in its discretion, give a *Prim* instruction.  Such an instruction should inform the jury that (1) the verdict must be unanimous, (2) the jury has a duty to continue to deliberate, (3) jurors must impartially consider the evidence, and (4) jurors should not hesitate to reexamine their views or change their opinions but should not do so simply to return a verdict or conform to the majority opinion.  *Prim*, 53 Ill. 2d at 75-76; *People v. Chapman*, 194 Ill. 2d 186, 222 (2000).  Whether and when to give the instruction are within the trial court's discretion.  *Chapman*, 194 Ill. 2d at 222.  Factors for the court to consider include "the length of time already spent in deliberation and the complexity of the issues before the jury."  *Id*.

¶ 68    Here, the trial court received a note that the jurors were "deadlocked" after about four hours of deliberations, following a four-day trial.  The court responded, "Your verdicts must be· unanimous. You should continue to deliberate further in an effort to reach a verdict based upon the evidence and testimony presented during the trial.  Do you want to continue tonight or come back tomorrow?  Please advise."  The jurors, who had previously sent out two notes seeking the clarification of legal terms and transcripts, decided to return the next day.  The following day, they deliberated for at least another three hours, sending out a variety of other notes indicating that they were actively considering various aspects of the case, before ultimately returning a verdict.  Even then, their verdict displayed a careful and thoughtful approach, convicting the defendant of only one count and acquitting him of the other.

¶ 69 The defendant argues that the instruction was coercive, similar to the instruction given in *People v. Wilcox*, 407 Ill. App. 3d 151, 164 (2010), because it did not clearly inform jurors that they had the option of not returning a verdict. This is a misstatement of the law, however; neither *Wilcox* nor *Prim* require a trial court to explicitly inform a jury that it has the the option of returning no verdict if they are unable to reach consensus. Rather, a trial court must simply respond in a way that does not foreclose that option or convey that a jury is required to reach a verdict. The trial court in *Wilcox* told the jurors that, when they were sworn in and placed under oath, they "pledged" to return a verdict, and continued, "Please continue to deliberate and obtain a verdict." *Id.* at 163. This response improperly conveyed to the jurors that they were required by their oath to reach a verdict and had to continue deliberating until they reached one. *Id.* at 164-65. Here, by contrast, the trial court did not suggest that the jurors were required to arrive at a verdict but simply instructed them to "deliberate further" (a directive that is entirely proper under *Prim*) "*in an effort to reach a verdict based upon the evidence and testimony presented during the trial*" (emphasis added). That phrasing in itself left open the possibility that such an effort might be unsuccessful. As such, it was not coercive. And because it was not an improper response, defense counsel did not render deficient performance by acquiescing in it.

¶ 70 In addition to attacking his counsel's representation in these two areas, the defendant asserts that his counsel rendered ineffective assistance in three other ways: by inadvertently omitting from the record one minute of the recording of A.V.'s statement; by failing to obtain records of calls from the defendant's phone on the morning after the party; and by eliciting harmful evidence about a prior arrest. We address each of these in turn.

¶ 71 In preparing for a portion of A.V.'s recorded statement to be played for the jury during the trial, defense counsel identified the portion from 25:48 to 26:18 as the relevant portion, and that

portion was played and admitted into evidence. However, when the jury asked for exhibits to aid its deliberations, defense counsel asserted that she had intended to identify 27:18, not 26:18, as the end point of the relevant portion. The portion that was actually played and admitted contained A.V.'s statements that A.P. was naked when she got out of the shower and that she was "sort of" naked in the bed as she "had a towel on." According to the defendant, the inadvertently-omitted minute contained A.V.'s statement that A.P. "didn't put her jammies on" when she got into bed.[3] Although the defendant contends that the omitted minute was "an important piece of evidence," it was merely cumulative of A.V.'s other statements, which indicated that, contrary to A.P.'s testimony, A.P. was not wearing clothes when she got into bed. Thus, even if the mistaken omission of this evidence constituted defective performance by the defendant's attorney, it did not prejudice the defendant such that there was a "reasonable probability that the result of the proceeding would have been different." *Houston*, 226 Ill. 2d at 144.

¶ 72      The defendant also criticizes his trial counsel for failing to obtain the records of his cell phone calls from the morning after the party. After trial, the defendant's mother did so, and discovered that they listed three calls from the defendant to A.P.'s phone, at 1:43 a.m., 7:42 a.m.,

---

[3] We note that the extra minute of A.V.'s statement is not in the record, and thus there is no record of what A.V. actually said during this minute. We could find this argument forfeited on that basis, as it is the responsibility of the appellant to supply a complete record sufficient to permit review of the issues it wishes to raise on appeal, and any doubts that arise from the incompleteness of the record must be resolved against the appellant. *People v. Carter*, 2015 IL 117709, ¶ 19. However, even if we assume that the defendant is accurately describing the contents of the omitted portion, we would find that the argument lacks merit.

and 7:46 a.m. The defendant asserts that these records helped him recall that A.P. had used his phone to try to locate her phone, and that they would have been helpful to his case because they would have supported his testimony that A.P. was awake and functioning. He attached the records to his post-trial motion and argued their relevance, but the trial court ruled that they did not qualify as "newly discovered" evidence. The defendant now recasts his argument as an ineffective-assistance claim.

¶ 73  We reject the defendant's argument on several grounds. First, he has not shown that competent counsel would have obtained these records. As he concedes, he had forgotten about his calls to A.P.'s phone, and thus we can infer that he did not tell his counsel about them. Nor would the allegations against the defendant have suggested that his cell phone records would be relevant to his defense. Thus, counsel had no reason to believe that the records would be a fruitful avenue for investigation. Second, his argument that the lack of these records prejudiced him is highly speculative. As he admits, the records do not show who made the calls from the defendant's phone to A.P., nor that she answered any of the calls. Without any further details, the records lacked any probative value. Accordingly, we find this argument meritless.

¶ 74  The final contention of ineffective assistance concerns the defense counsel's questioning of A.P., on cross-examination, about a previous arrest of the defendant. Contrary to the defendant's assertions on appeal, the record shows that defense counsel did not intentionally elicit this testimony. Rather, in attempting to show that the defendant and A.P. became attracted to each other and were conversing deeply, sharing intimate information with each other—evidence that would support the defendant's later testimony to that effect—defense counsel asked A.P. if she remembered the defendant sharing details of his life with her. A.P. replied that he told her about "being charged because he was fighting an officer" and showed her pictures. Evidently not

expecting this answer, defense counsel began to question A.P. further about the incident, asking what the pictures were of and whether the defendant told her that he was arrested. The State objected and, during the sidebar, the trial court asked defense counsel whether she really wanted to inquire further into this area. Defense counsel explained that she believed A.P. was confused and was thinking of someone else at the party, because the defendant had not been arrested for that, and the defense intended to present proof that someone else had been arrested. When the cross-examination resumed, defense counsel simply established when the conversation occurred and then moved on to other events. The defense never called any witnesses to show that A.P. was mistaken or that someone else at the party was arrested for fighting with police. On rebuttal after the defendant testified, the State introduced evidence that the defendant had four prior convictions. None of them was for resisting arrest, although one was for an unspecified aggravated battery.

¶ 75    There is a strong presumption that counsel's actions or inactions, including the questioning of witnesses, constitute sound strategy. *Perry*, 224 Ill. 2d at 341-42. To prove otherwise, a party must show that counsel's decision was so irrational and unreasonable that no reasonably effective attorney, facing like circumstances, would pursue such a strategy. *Jones*, 2012 IL App (2d) 110346, ¶ 82. That standard was not met here. Defense counsel's inquiry into the details of A.P.'s report that the defendant revealed an arrest for fighting with police may have been misguided, especially in light of counsel's later failure or inability to present contrary evidence. Nevertheless, even a competent attorney, surprised by negative testimony, may reasonably determine that the best hope of negating the testimony lies in impeaching the witness. To do so effectively, the witness must be questioned at least briefly about the details of the reported event, so that those details can be disproven. Moreover, although other-crimes evidence ordinarily is considered prejudicial, in this case the impact of A.P.'s testimony about the defendant's arrest was blunted by

the evidence that he had four prior convictions, one of which was for aggravated battery. In light of this greater evidence of other crimes, which was properly admitted to cast doubt on the defendant's credibility, defense counsel's brief inquiry into A.P.'s report of a conversation with the defendant about his arrest was not so prejudicial as to create a reasonable probability that without that inquiry, the jury would have acquitted the defendant. *Houston*, 226 Ill. 2d at 144.

¶ 76    Finally, the defendant contends that, even if his counsel's individual deficiencies do not meet the *Strickland* standard, cumulatively they amount to reversible error. As we have determined that none of the alleged deficiencies constituted ineffective representation or caused the defendant meaningful prejudice, we reject this contention as well.

¶ 77                    E. Evidentiary Ruling on Other-DNA Evidence

¶ 78    The defendant next argues that the trial court abused its discretion in excluding certain evidence, and that this error deprived him of a fair trial. Specifically, the defendant challenges the exclusion of the evidence that, in addition to the defendant's DNA, DNA from someone other than the defendant was also found on A.P.'s underwear.[4] The determination of whether evidence is admissible is within the sound discretion of the trial court, and we will not reverse that determination unless there has been a clear abuse of its discretion. *People v. Montano*, 2017 IL App (2d) 140326, ¶ 74. A trial court abuses its discretion when its ruling is arbitrary, fanciful, or

---

[4] As we noted earlier (see note 2, *supra*), the defendant failed to supplement the record through an offer of proof with the DCFS records he wished the trial court to admit, and we denied his motion to supplement the record on appeal with the unadmitted records. He then withdrew his argument relating to the barring of those records and any testimony based on them. We therefore do not address that argument or make any ruling with respect to it.

unreasonable, or no reasonable person would take the view adopted by the trial court, or when its ruling rests on an error of law. *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11.

¶ 79 The trial court excluded the evidence under the rape-shield statute, section 115-7(a) of the Code (725 ILCS 5/115-7(a) (West 2014)). That law bars, in sexual assault cases such as this one, the introduction of evidence of the prior sexual activity or reputation of the alleged victim, except (1) to show that the victim consented to the sexual conduct on which the offense is based, or (2) "when constitutionally required to be admitted." *Id*. A defendant has a constitutional right to present evidence that is "*directly* relevant to matters at issue in the case, notwithstanding that it concern[s] the victim's prior sexual activity." (Emphasis in original.) *People v. Santos*, 211 Ill. 2d 395, 405-06 (2004). But evidence of the alleged victim's sexual history "is not 'constitutionally required to be admitted' unless it would make a meaningful contribution to the fact-finding enterprise." *People v. Maxwell*, 2011 IL App (4th) 100434, ¶ 76 (quoting 725 ILCS 5/115-7(a) (West 2010)).

¶ 80 The defendant conceded that he and A.P. had sex, and thus the issue at trial was whether he knew that A.P. could not knowingly consent to that sex. The other-DNA evidence is not directly relevant to the defendant's knowledge about A.P.'s ability to consent: whether she also had sex with someone else has no bearing on whether she consented to have sex with him or whether he knew she could not consent. However, he argues that the other-DNA evidence would be relevant to show that A.P.'s genital soreness could have been caused by someone other than him, and that the person in the shower with her when she vomited could have been someone else, thereby lending credence to his assertion that he did not know she was intoxicated enough to be ill and vomiting.

¶ 81 The trial court did not err in barring the defendant from presenting the other-DNA evidence. As the trial court and the parties discussed during the hearings on the defendant's

multiple motions *in limine* on this subject, the other DNA could have been deposited in A.P.'s vagina up to 72 hours before it was collected, and so the mere presence of that DNA could not establish whether A.P. had sex with someone else on the night of the party. The trial court permitted the defendant to ask A.P. whether she recalled having sex with anyone else that night, and A.P. said she did not. As the other-DNA evidence was not directly relevant to any issue in the trial, its admission was not constitutionally required and the trial court did not abuse its discretion in excluding it. *Santos*, 211 Ill. 2d at 405-06; *Maxwell*, 2011 IL App (4th) 100434, ¶ 76.

¶ 82                     F. Evidentiary Hearing on Juror's Statement

¶ 83    On June 17, 2020, about six months after the trial, juror Robert Schillinger provided a verified statement saying that, on the evening after the first night of deliberations, he and other jurors were in the courthouse parking lot when they saw the defendant "peel out" of the parking lot. The next day, the jurors discussed what they observed, and "several" jurors said they felt intimidated and threatened by "the encounter." According to Schillinger, other jurors then discussed feeling "scared" and "frightened of retaliation," and "not wanting to run into him [the defendant] again." The verified statement did not say that any jurors reported that their feelings affected their ability to reach fair and impartial verdicts based on the evidence.

¶ 84    On appeal, the defendant complains that the verified statement was evidence of improper extraneous information (some jurors' observations of the defendant outside the courtroom) that may have affected their verdicts, and thus the trial court should have held an "evidentiary hearing" regarding the verified statement. However, the defendant has waived this argument.

¶ 85    The defendant submitted Schillinger's statement in connection with his motion for a new trial. At the hearing on that motion, after the defendant had presented the testimony of a witness (regarding the phone records), the trial court asked whether he wished to call any other witnesses.

The defendant asked to submit the verified statement. The trial court then specifically asked whether the defense wanted to call Schillinger as a witness or simply use the verified statement, to which the defense replied, "I'm asking to use the affidavit [*sic*]." As noted earlier, "a party cannot complain of error which that party induced the court to make or to which that party consented." *Swope*, 213 Ill. 2d at 217. By failing to ask for such a hearing and instead telling the trial court that he simply wished to place Schillinger's statement into evidence, the defendant waived his ability to raise this argument on appeal.

¶ 86    Even if he had not waived it, the argument has no merit. A party challenging a jury verdict on the basis that jurors were exposed to improper external influences "must establish prejudice by showing that the information relates directly to something at issue in the case and that it may have influenced the verdict." *People v. Willmer*, 396 Ill. App. 3d 175, 181 (2009). In assessing this possibility, a court must focus on the nature of the conduct alleged to be an improper external influence. "[E]vidence relating to the effect of such influences on the mental processes of the jurors is inadmissible." *People v. Hobby*, 182 Ill. 2d 404, 458 (1998). Thus, Schillinger's perceptions of the effect of the conduct on the jurors must be set aside.

¶ 87    Here, the defendant has no convincing argument as to how his burst of speed leaving the courthouse parking lot late at night related to any issue in the case. Further, any assertion of prejudice must be assessed by asking "whether the conduct at issue involved such a probability of resulting prejudice that the verdict must be deemed inherently lacking in due process." *Id*. Peeling out of a parking lot, without more, simply does not meet this standard.

¶ 88                                III. Conclusion

¶ 89    The motion to strike certain portions of the defendant's opening brief is denied. For the reasons stated, the judgment of the circuit court of Kendall County is affirmed.

¶ 90    Affirmed.