# Illinois Official Reports

## Appellate Court

---

### *People v. Relerford*, 2016 IL App (1st) 132531

---

Appellate Court
Caption

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WALTER RELERFORD, Defendant-Appellant.

District & No.

First District, Sixth Division
Docket No. 1-13-2531

Filed

June 24, 2016

Decision Under
Review

Appeal from the Circuit Court of Cook County, No. 12-CR-8636; the Hon. William G. Lacy, Judge, presiding.

Judgment

Vacated.

Counsel on
Appeal

Michael J. Pelletier, Patricia Mysza, Kate Schwartz, and Jonathan Yeasting, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, Kathryn Schierl, and Veronica Calderon Malavia, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE DELORT delivered the judgment of the court, with opinion. Presiding Justice Rochford and Justice Hoffman concurred in the judgment and opinion.

**OPINION**

¶ 1  After a bench trial, defendant Walter Relerford was convicted of stalking and cyberstalking. He was originally sentenced to six years' imprisonment and one year of mandatory supervised release (MSR). Several months after the original sentencing hearing, the court reconvened and sentenced defendant to four years of MSR on the basis that it had imposed the MSR portion of the original sentence in error. On appeal, defendant contends that his convictions should be vacated because the statutes under which he was convicted (720 ILCS 5/12-7.3(a)(1), (2), 12-7.5(a)(1), (2) (West 2012)) violate state and federal constitutional guarantees of free speech and due process. He also contends that he is entitled to a new trial because the trial court ignored his requests to proceed *pro se*. Finally, he asks that we vacate his term of four years of MSR and reinstate the original term of one year. For the reasons that follow, we find that the statutes are unconstitutional and therefore vacate defendant's conviction and sentence on that basis alone. Accordingly, we need not reach the remaining issues.

¶ 2           BACKGROUND

¶ 3  Defendant was charged by indictment with two counts of stalking (720 ILCS 5/12-7.3(a)(1), (2) (West 2012)) (the general stalking statute) and two counts of cyberstalking (720 ILCS 5/12-7.5(a)(1), (2) (West 2012)) (the cyberstalking statute). In particular, the indictments collectively alleged that defendant: (1) called Sonya Blakey on the telephone; (2) sent her e-mails; (3) stood outside of her place of business; (4) entered her place of business; and (5) made multiple posts on his Facebook page threatening Blakey's coworkers and expressing his desire to engage in sexual acts with Blakey. The indictments further alleged that defendant "knew or should have known" that his conduct "would cause a reasonable person to suffer emotional distress" and "fear for her safety."

¶ 4  At trial, Sonya Blakey testified that she worked for Clear Channel Media and Entertainment (CCME), where she managed and appeared on-air for a gospel radio station called Inspiration 1390. Beginning in May 2011, defendant began working as an intern at Inspiration 1390. His internship ended the following August. Around September or October 2011, he applied for an open position as a board operator at the station. Blakey and Derrick Brown, one of her coworkers, interviewed defendant for the position. After the interview, defendant sent Blakey a follow-up e-mail asking if the position had been filled.

¶ 5  At some point, defendant was informed that he was not being offered the position. In response, defendant called and e-mailed Blakey, as well as several of her colleagues, asking whether he could intern at the station again. Blakey testified that she received five e-mails from defendant.

¶ 6  In January 2012, Blakey became aware that defendant was also contacting other CCME employees. At that point, Blakey's manager told her to report any e-mails or phone calls that she received from defendant to human resources staff. According to Blakey, sometime between January and March 2012, CCME took the position that defendant was not welcome at the station and that his calls and e-mails should go unreturned. Jeffrey Garceau, an executive assistant to CCME's president, testified that sometime around late March or early April 2011, he told defendant to stop contacting CCME employees.

¶ 7    In March 2012, while Blakey was leaving her downtown Chicago office, she looked through a glass window on the ground floor and saw defendant standing outside with some friends. Defendant saw Blakey and waved at her. Blakey did not wave back and continued on her way. She testified that this encounter made her "scared" and "nervous."

¶ 8    Blakey next encountered defendant on April 4, 2012. That day, while Blakey was in the studio broadcasting live, defendant walked into the studio unannounced. Blakey explained that defendant's act of entering the studio caused her to feel "startled," "nervous," and "violated." According to Blakey, she had to switch her show to automated programming when defendant entered because she "was very nervous, very startled, shocked, scared, nervous, and *** didn't know what to expect with him being there." Ultimately, Blakey and one of her colleagues escorted defendant from the building.

¶ 9    On April 9, 2012, Blakey received an e-mail from defendant apologizing for the April 4 incident. In the e-mail, defendant stated, "[m]y intentions were not to startle you or to catch you off guard." Around the time that defendant sent that e-mail, one of Blakey's colleagues who was a Facebook friend of defendant informed Blakey that defendant had made several postings on Facebook about Blakey. Blakey and defendant were not Facebook "friends," so Blakey could not see defendant's posts through her own Facebook account. However, Blakey's colleague e-mailed the posts to Blakey.

¶ 10    In his first post, defendant demanded a job at CCME and, in a somewhat rambling manner, made a thinly veiled threat toward CCME's employees if he was not given a job. In his second post, defendant wrote, "[t]he order: If Sonya's vagina is not in my mouth by next Friday, bury the entire Michigan State football team from 1993. That's the order. Send it through. One hundred." Defendant's third post described his affection for Blakey and long-held desire to obtain employment at CCME. Defendant's fourth post stated "How am I gay? I want to fuck Sonya. There's nothing gay about that." Lastly, defendant's fifth post contained a disjointed statement about Blakey, CCME, and an unidentified group of "Chinese people" whom defendant claimed were "talking about killing everyone" at CCME.

¶ 11    After CCME and Blakey became aware of the Facebook posts, CCME advised Blakey to stay home from work until the police located defendant. Blakey took some time off from work around April 11 or 12 because defendant's actions made her feel "uncomfortable *** just a little bit uneasy, a little scared, a little fearful." After defendant was apprehended on April 12, Blakey returned to work.

¶ 12    On cross-examination, Blakey testified that she did not recall defendant making any threats in any of the e-mails he sent to her and her colleagues regarding employment opportunities at CCME. With respect to the March 2012 incident, Blakey conceded that defendant did not verbally communicate with her. She testified that defendant did not enter the building during the incident but rather stayed outside on the sidewalk with a group of friends. Moreover, she acknowledged that the ground level of the building where CCME's offices are located contains several businesses and restaurants.

¶ 13    Blakey admitted that defendant did not threaten her while he was at the studio on April 4 and that he did not put up a struggle when Blakey and her colleague escorted him from the premises. As to defendant's April 9 e-mail to Blakey, she conceded that the e-mail did not contain any statement threatening her safety or the safety of anyone at CCME. With respect to the Facebook postings, Blakey acknowledged that defendant did not send the posts directly to her and that she saw them only because a colleague showed them to her.

¶ 14     After the conclusion of testimony and closing arguments, the court found defendant "guilty as charged." On July 23, 2013, the court sentenced defendant to six years' imprisonment and one year of mandatory supervised release (MSR). The order of commitment entered by the court indicates that defendant was sentenced only on count I, which alleged a violation of section 7.3(a)(2), a provision of the general stalking statute. 720 ILCS 5/12-7.3(a)(2) (West 2012). On January 7, 2014, the court held a supplemental hearing. The court noted that it had sentenced defendant to one year of MSR, but stated that the "sentence was in error" because due to a "change *** in the law, on a charge of stalking, mandatory supervised release term is four years." The court accordingly issued a "[c]orrected" mittimus, *nunc pro tunc* to July 23, 2013, reflecting a four-year MSR term. This appeal followed.

¶ 15                                         ANALYSIS

¶ 16     On appeal, defendant contends that subsections (a)(1) and (a)(2) of the general stalking and cyberstalking statutes are facially unconstitutional and unconstitutional as applied to him under the first and fourteenth amendments to the United States Constitution. Specifically, defendant argues that the stalking statutes violate the first amendment because they restrict a substantial amount of protected speech and that the statutes violate the due process clause because, *inter alia*, they do not contain a *mens rea* requirement. Defendant has raised similar challenges under the Illinois Constitution. See Ill. Const. 1970, art. I, §§ 2, 4. However, because the Illinois Supreme Court has interpreted the Illinois Constitution's due process and free speech protections as generally coextensive with the federal constitution's free speech and due process protections, we will first consider defendant's federal claims. See Ann M. Lousin, The Illinois State Constitution: A Reference Guide 46 (Praeger 2010) (citing *City of Chicago v. Pooh Bah Enterprises, LLC*, 224 Ill. 2d 390 (2006)) (suggesting that the free speech clause of the Illinois Constitution may be narrower than the first amendment); *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673, ¶ 55 (due process clause of Illinois Constitution is coextensive with federal due process guarantees).

¶ 17     In *People v. Bailey*, 167 Ill. 2d 210 (1995), the supreme court rejected a first amendment and due process challenge to the version of the Illinois stalking statute that was in effect in 1992. *Id.* at 225-27. The 1992 statute provided that a person committed the offense of stalking by "transmit[ting] to another person a threat with the intent to place that person in reasonable apprehension of death, bodily harm, sexual assault, confinement or restraint" and then in furtherance of the threat either follows or surveils the target on more than one occasion. 720 ILCS 5/12-7.3(a) (West 1992). Between 1992 and 2010, the legislature revised the stalking statute seven times. The first six revisions retained the general requirement that an individual must "transmit to another person a threat with the intent to place that person in reasonable apprehension of death, bodily harm, sexual assault, confinement or restraint" to commit the offense of stalking. See, *e.g.*, Pub. Act 88-402, § 5 (eff. Aug. 20, 1993) (requiring that defendant "transmit[ ] a threat *** of immediate or future bodily harm, sexual assault, confinement or restraint" or place a person "in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or restraint"); Pub. Act 88-677, § 20 (eff. Dec. 15 1994) (same); Pub. Act 89-377, § 15 (eff. Aug. 18, 1995) (same); Pub. Act 91-640, § 5 (eff. Aug. 20, 1999) (same); Pub. Act 92-827, § 5 (eff. Aug. 22, 2002) (same); Pub. Act 95-33, § 5 (eff. Jan. 1, 2008) (same).

- 4 -

¶ 18    In 2009, the legislature significantly amended the stalking statute. See Pub. Act 96-686, § 5 (eff. Jan. 1, 2010). The 2009 amendments: (1) removed the threat requirement from the definition of the general stalking offense; (2) created subsection (a-3), which retained the threat-centric definition of stalking that was present in the statute since 1992; and (3) redefined the general offense of stalking in section (a). Accordingly, *Bailey* and similar cases relied on by the State do not control our analysis of defendant's constitutional claims.

¶ 19    In its current form, section (a) of the general stalking statute provides:

> "A person commits stalking when he or she knowingly engages in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to:
>
>> (1) fear for his or her safety or the safety of a third person; or
>>
>> (2) suffer other emotional distress." 720 ILCS 5/12-7.3(a)(1), (2) (West 2012).

¶ 20    The general stalking statute defines "course of conduct" as:

> "2 or more acts, including but not limited to acts in which a defendant directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, threatens, or communicates to or about, a person, engages in other non-consensual contact, or interferes with or damages a person's property or pet. A course of conduct may include contact via electronic communications." 720 ILCS 5/12-7.3(c)(1) (West 2012).

The statute further defines "emotional distress" as "significant mental suffering, anxiety or alarm" (720 ILCS 5/12-7.3(c)(3) (West 2012)) and "reasonable person" as "a person in the victim's situation" (720 ILCS 5/12-7.3(c)(8) (West 2012)).

¶ 21    In *People v. Douglas*, 2014 IL App (5th) 120155, the Fifth District rejected a due process challenge to subsection (a) of the general stalking statute on the basis that it did not contain a *mens rea* requirement. *Id.* ¶ 39. However, after the court's decision in *Douglas*, the United States Supreme Court handed down its decision in *Elonis v. United States*, 575 U.S. ___, 135 S. Ct. 2001 (2015), which compels a result different from that in *Douglas*.

¶ 22    In *Elonis*, the Court held that due process precluded the government from convicting a defendant under a federal stalking statute because the defendant's conviction "was premised solely on how his posts would be understood by a reasonable person." *Id.* at ___, 135 S. Ct. at 2011. The defendant was charged with violating a federal statute that made it a crime to " 'transmit[ ] in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another' " after he made several Facebook posts about his ex-wife containing violent imagery. *Id.* at ___, 135 S. Ct. at 2008 (quoting 18 U.S.C. § 875(c) (2006)).

¶ 23    At trial, the defendant requested a jury instruction stating " 'the government must prove that he intended to communicate a true threat,' " but the district court refused to tender the instruction. *Id.* at ___, 135 S. Ct. at 2007. In its closing argument, the government explicitly claimed that it was not relevant whether the defendant intended his posts to be threats, stating " 'it doesn't matter what he thinks.' " *Id.* at ___, 135 S. Ct. at 2007. A jury found the defendant guilty, and the court of appeals affirmed his conviction.

¶ 24    The Supreme Court reversed. The court noted that the defendant and the government both agreed that "a defendant under Section 875(c) must know that he is transmitting a communication." *Id.* at ___, 135 S. Ct. at 2011. "But," the Court explained, "communicating

*something* is not what makes the conduct 'wrongful.' " (Emphasis in original.) *Id.* at ___, 135 S. Ct. at 2011. Instead, the Court noted, " 'the crucial element separating legal innocence from wrongful conduct' is the threatening nature of the communication." *Id.* at ___, 135 S. Ct. at 2003 (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 73 (1994)). The problem, though, was that the defendant's conviction "was premised solely on how his posts would be understood by a reasonable person." *Id.* at ___, 135 S. Ct. at 2011. The Court explained that imposing criminal liability using a "reasonable person" standard was incompatible with due process requirements:

> "Such a 'reasonable person' standard is a familiar feature of civil liability in tort law, but is inconsistent with 'the conventional requirement for criminal conduct–*awareness* of some wrongdoing.' [Citation.] Having liability turn on whether a 'reasonable person' regards the communication as a threat–regardless of what the defendant thinks–'reduces culpability on the all-important element of the crime to negligence,' [citation], and we 'have long been reluctant to infer that a negligence standard was intended in criminal statutes,' [citations]. Under these principles, 'what [Elonis] thinks' does matter." *Id.* at ___, 135 S. Ct. at 2011.

¶ 25 We note that *Elonis* was decided in 2015. Thus, neither the legislature, when it amended the stalking statute in 2009, nor the judge who presided over defendant's trial in 2013, had the benefit of the Supreme Court's guidance on this issue.

¶ 26 As noted above, defendant was sentenced for violating subsection (a)(2) of the general stalking statute. That section criminalizes a wide range of conduct, including communicating to or about a person. But, like the statute at issue in *Elonis*, "communicating *something* is not what makes *** conduct 'wrongful' " under subsection (a)(2). (Emphasis in original.) *Id.* at ___, 135 S. Ct. at 2011. Instead, an individual's conduct is criminal under section (a)(2) if, and only if, the defendant "knows or should know" that it would cause "reasonable person" to "suffer *** emotional distress." 720 ILCS 5/12-7.3(a)(2) (West 2012). Subsection (a)(2) contains no requirement that the individual actually intend to inflict emotional suffering on a person. Thus, as currently drafted, subsection (a)(2) bypasses " 'the conventional requirement for criminal conduct–*awareness* of some wrongdoing' " in favor of a reasonable person standard of criminality. (Emphasis in original.) *Elonis*, 575 U.S. ___, 135 S. Ct. at 2011 (quoting *Staples v. United States*, 511 U.S. 600, 606-07 (1994)). This is a standard which the due process clause does not permit. *Id.* at ___, 135 S. Ct. at 2011 ("defendant could face 'liability in a civil action for negligence, but he could only be held criminally for an evil intent actually existing in his mind' " (quoting *Cochran v. United States*, 157 U.S. 286, 294 (1895))).

¶ 27 Accordingly, we hold that subsection (a)(2) of the general stalking statute, of which defendant was convicted and sentenced, lacks a *mens rea* requirement and is therefore facially unconstitutional under the due process clause of the fourteenth amendment.

¶ 28 We next address defendant's claims concerning his convictions under subsection (a)(1) of the general stalking statute and subsections (a)(1) and (a)(2) of the cyberstalking statute. At the outset, we must address our jurisdiction to consider these claims. The State suggests that we lack jurisdiction over defendant's convictions under subsection (a)(1) of the general stalking statute and subsections (a)(1) and (a)(2) of the cyberstalking statute because sentence was not entered on those convictions.

¶ 29 Our jurisdiction extends only to "final judgments." Ill. Const. 1970, art. VI, § 6. And, as the supreme court has explained, "it is axiomatic that there is no final judgment in a criminal case

until the imposition of sentence, and, in the absence of a final judgment, an appeal cannot be entertained." *People v. Flores*, 128 Ill. 2d 66, 95 (1989). But, as the State concedes in its appellate brief, the supreme court has also explained that the appellate court should entertain jurisdiction where a defendant has sentenced and unsentenced convictions and the sentenced conviction has been vacated. See *People v. Dixon*, 91 Ill. 2d 346, 353-54 (1982). Furthermore, defendant has standing to raise this challenge because he was criminally prosecuted and convicted for violating these statutes. *People v. Aguilar*, 2013 IL 112116, ¶ 12 (finding that a criminal defendant had standing to make a facial challenge to a criminal statute under similar circumstances).

¶ 30    Since we have found that the statute pursuant to which defendant was convicted *and* sentenced is unconstitutional, his conviction thereunder must be vacated. And since defendant's conviction under subsection (a)(2) is vacated, we have jurisdiction to consider his challenges to his remaining convictions.

¶ 31    Subsection (a)(1) of the general stalking statute violates due process for the same reason as subsection (a)(2), as it does not contain a mental state requirement. Under subsection (a)(1), a defendant can be convicted of stalking if he or she engages in course of conduct and "knows or should know" that the course of conduct would "cause a reasonable person to *** fear for his or her safety or the safety of a third person." 720 ILCS 5/12-7.3(a)(1) (West 2012). Like subsection (a)(2), criminality under subsection (a)(1) turns entirely on whether the defendant "knows or should know" how a "reasonable person" would react to the defendant's conduct, without regard to the defendant's subjective intentions. The two sections differ only in that subsection (a)(2) requires the victim to suffer emotional distress, whereas subsection (a)(1) requires the victim to fear for his or her safety or the safety of a third person. Subsection (a)(1) of the general stalking statute is therefore facially unconstitutional under the due process clause of the fourteenth amendment.

¶ 32    We next consider defendant's challenge to subsections (a)(1) and (a)(2) of the cyberstalking statute. Subsection (a) of the cyberstalking statute provides:

> "(a) A person commits cyberstalking when he or she engages in a course of conduct using electronic communication directed at a specific person, and he or she knows or should know that would cause a reasonable person to:
>
>> (1) fear for his or her safety or the safety of a third person; or
>>
>> (2) suffer other emotional distress." 720 ILCS 5/12-7.5(a)(1), (2) (West 2012).

¶ 33    Subsections (a)(1) and (a)(2) of the cyberstalking statute are virtually identical to subsections (a)(1) and (a)(2) of the general stalking statute. The principal difference is that the cyberstalking statute specifies that the defendant's course of conduct involved electronic communications. It necessarily follows then, that subsections (a)(1) and (a)(2) of the cyberstalking statute, which also lack a *mens rea* requirement, are facially unconstitutional under the due process clause of the fourteenth amendment for the same reason that subsections (a)(1) and (a)(2) of the general stalking statute are unconstitutional.

¶ 34                                    CONCLUSION

¶ 35    Accordingly, we vacate defendant's convictions for violating the statutes in question. Based on this disposition, we need not consider defendant's other contentions.

¶ 36            Vacated.