2022 IL App (2d) 210511-U
No. 2-21-0511
Order filed December 22, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| AMBER POKORNY, | ) | Appeal from the Circuit Court |
| | ) | of Kendall County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-OP-16 |
| | ) | |
| LORI W. DeBOLT, | ) | Honorable |
| | ) | Joseph R. Voiland, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*: A plenary order of protection barring respondent from disseminating on social media any information identifying petitioner in any way, was improper. The petitioner failed to meet her burden to show that the first amendment did not protect respondent's communications that were the basis for the order.

¶ 2   Respondent, Lori W. DeBolt, appeals a judgment issuing a plenary order of protection under the Stalking No Contact Order Act (Act) (740 ILCS 21/10 *et seq.* (West 2020)) and an injunction in favor of petitioner, Amber Pokorny, and her daughters, A. Z. and A.V. Respondent contends that (1) the portion of the Act under which the court entered the order is facially

unconstitutional, (2) the same portion of the Act is unconstitutional as applied, and (3) the injunction is an unconstitutional prior restraint on free speech. We reverse.

¶ 3                                                I. BACKGROUND

¶ 4        On January 22, 2021, petitioner filed a *pro se* petition under the Act to bar respondent from stalking or contacting her, A.Z., or A.V. In support, petitioner listed the following seven writings as justifying the requested order. On June 28, 2020, respondent "post[ed]" that she was praying for "Billy," who had not seen his daughter for a year. On July 4, 2020, respondent posted on Facebook that petitioner had alienated the father of A.Z. and had abducted A.V. and taken her out of state. She also went into detail about a "claimed Rape." On July 7, 2020, respondent posted on Facebook that petitioner repeatedly lied to alienate her daughters from their fathers. On December 23, 2020, she posted on Facebook petitioner's "victim statement" and wrote that "Amber lies" were "destroying our men." On December 31, 2020, she posted on Facebook that petitioner had (1) falsely accused respondent's son of a crime, (2) falsely accused the father of one of petitioner's daughters of abusing the girl, and (3) forced her daughter to accuse petitioner's ex-husband of sexual assault. On January 2, 2021, she posted on Facebook, urging "Amber" to stop lying and let her daughter see her father, even though the father had never contested the matter in court. Finally, on January 5, 2021, respondent posted petitioner's "police Report" on Facebook and stated that petitioner was alienating her daughter from her father.

¶ 5        Petitioner also alleged that, in the summer of 2020, respondent contacted A.Z.'s father and spoke to him about the custody issue. Further, respondent attended the trial in petitioner's custody case against A.V.'s father and had been helping him. Finally, respondent contacted another man and his ex-wife on Facebook and shared details about a 2013 custody order in A.V.'s custody case.

¶ 6    On February 10, 2021, the trial court held an evidentiary hearing. Both parties appeared *pro se*. For petitioner, A.Z. testified as follows. Her father had contacted her about the Facebook posts. Going through social media, she had seen false information about her and petitioner. These posts had made A.Z. very nervous and had traumatized her by "bringing up a lot of back story" and leading to considerable contact with her father. A.Z. did not want contact with him, because they had "no relationship" and he was abusive when there was contact.

¶ 7    A.Z. testified that she had seen petitioner's full name displayed on some posts. One document was posted on Twitter. A.Z. pointed out the document from a group of documents shown to her. Nothing in the record identifies this document more specifically[1]. However, two exhibits are consistent with A.Z.'s description of the document. The first was later placed into evidence as petitioner's exhibit B. On April 12, 2020, respondent posted on Twitter:

> "She has her two daughters believing she was raped all so the fathers and Family Services wouldn't take the girls away from her. Amber Pokorny has 2 DNA [*sic*] and the court covered up her lies for a fast win. False Accusers are done lying in court."

---

[1]The identification of the various exhibits to which the witnesses testified is not always simple or clear, to put the matter mildly. Respondent's brief states, "It is unclear what exhibits were introduced by which witness, and thus [the brief's] citations are based on the Petitioner's [*sic*] best understanding." The "Court Exhibit Sheet," filed February 10, 2021, as part of the common-law record, describes these documents as a "Bundle of unmarked Exhibits intermixed together from Petitioner & Respondent." However, the ambiguity does not hinder our review, as the most crucial exhibits can be identified and many of the remaining exhibits are of no real importance on review.

The second was shorter and less specific. It was later admitted as petitioner's exhibit A. On September 11, 2020, one Arunder Sigh posted on Twitter, "Write your horror story in two words." On September 12, 2020, respondent replied, in full, "Amber pokorny [*sic*]."

¶ 8    Petitioner testified in narrative form that she had no personal relationship with respondent. After a court case involving respondent's son and petitioner[2], respondent (1) made personal information public; (2) contacted petitioner's ex-husband, family members, and friends; and (3) "post[ed] many things all over social media," much of it false, using petitioner's full name.

¶ 9    Petitioner introduced into evidence and identified several documents. Exhibit A was the Twitter post of September 12, 2020. Exhibit B was the Twitter post of April 12, 2020.

¶ 10    Exhibit C was a conversation on Facebook messenger between (1) respondent, who, according to petitioner, was using an alias, and (2) "a guy that [petitioner was] in a relationship with, one of his close friends." Respondent objected to the admission of exhibit C. The court admitted the exhibit but cautioned petitioner that it would give the document little weight unless she could establish that it "actually came from [respondent]." We have found no exhibit labeled "C." For this reason and those given by the trial court, we disregard this alleged evidence, as its relevance to the issues on appeal is uncertain at best.

---

[2]The case was *People v. DeBolt*, 2022 IL App (2d) 200784-U, in which petitioner was the complaining witness. The jury found the defendant, Kevin DeBolt, guilty of one count of criminal sexual assault of someone who was unable to give knowing consent to sexual penetration (720 ILCS 5/11-1.20(a)(2) (West 2016)). The trial court sentenced him to seven years' imprisonment. *Id.* ¶ 2. We affirmed the judgment. *Id.*

¶ 11    Next, petitioner identified a document, claiming it was a Facebook messenger conversation between respondent, using an alias, and the ex-wife of petitioner's fiance. The court admitted the document with the same cautionary admonishment as exhibit C. For reasons similar to those we gave for disregarding exhibit C, we also disregard this alleged evidence.

¶ 12    On cross-examination by respondent, petitioner testified that she discovered these documents by doing a Google search of social media, using her own name. None of the posts were directed to petitioner. Petitioner rested.

¶ 13    Respondent testified in narrative form. She introduced without objection several social media posts. Respondent stated that she made all the posts on her own "platform" and never sent a message to petitioner or posted on her wall. Respondent was the board secretary for National Coalition for Men, Chicago, and a director for a separate organization, Warriors Against False Accusations. She posted on social media on behalf of people who supported the wrongfully accused. Respondent posted documents that concerned petitioner, but she made sure not to include her full name or any other identifying information.

¶ 14    Respondent testified that some documents were created when A.Z. posted on respondent's Facebook page in December 2020 and January 2021. A.Z. revealed petitioner's full name in several of her posts, but respondent promptly deleted these posts. Respondent had spoken with Billy V., petitioner's ex-husband, who was trying to obtain the right to see A.V.

¶ 15    On cross-examination by petitioner, respondent testified as follows. On January 2, 2021, she posted, "Amber, you know deep down what happened. Stop the lie. Your daughter deserves and needs to see her father." However, the post was "about *** all of the Ambers out there *** that are doing this to their children." The document "was not posted directly at [petitioner]."

¶ 16    Respondent testified that she had reached out to Billy V. and his sister and had been talking with them for a long time. She admitted that, once, in the September 12, 2020, Twitter response, she used petitioner's full name.

¶ 17    Respondent testified that she posted on YouTube, a presentation for the virtual conference of a men's-rights organization. The video had a general focus but told how her son had been falsely accused of a sexual crime and how Billy V. had been falsely accused of abusing his daughter. However, the video never mentioned petitioner's name. Respondent stated that, in her posts, she exercised her rights under the first amendment.

¶ 18    Respondent rested.

¶ 19    After hearing arguments, the trial court stated as follows. Under section 80(a) of the Act (740 ILCS 21/80(a) (West 2020)), if a petitioner "has been a victim of stalking, a stalking no contact order shall issue." As pertinent here, section 10 states that a person commits stalking when that person "engage[s] in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to *** suffer emotional distress." 740 ILCS 21/10 (West 2020). "Emotional distress" is "significant mental suffering, anxiety, or alarm." *Id*.

¶ 20    The trial court explained that respondent had engaged in advocacy, but "when it becomes personal, you cross the line." Respondent's contention that she never identified petitioner in her social media posts was false; she had "consistently and repeatedly ma[de] reference to Amber Pokorny." In her April 12, 2020, post, she stated, " 'Amber Pokorny had two DNA [*sic*], and the court covered up her lies for a fast [win].' "

¶ 21    The court continued:

"I understand that you have a first amendment privilege, but sometimes the first amendment privilege contravenes certain statutes that are enacted by the State of Illinois, and this is one of those cases.

And again, it's the old adage, you have a first amendment right, but you can't yell fire in a crowded theater. And that's what you're doing.

You are making allegations that the court specifically finds that [*sic*] the material that you're printing has the intended effect to cause emotional distress to [petitioner]. And it's going to stop.

And I'm entering an order extending this order of protection for two years. And this order of protection indicates *** that you're prohibited from threatening to commit or committing stalking personally or through a third-party [*sic*]. That you may not contact the petitioner or other protected persons in any way, directly or indirectly through third parties, okay, in any manner.

And I'm also adding *** injunctive relief that says, you shall not disseminate any information on social media identifying the petitioner in any way."

¶ 22    The court entered a written order to the foregoing effect. Respondent, through counsel, moved to reconsider the judgment but did not raise any constitutional issues. The trial court denied respondent's motion. She timely appealed.

¶ 23                                    II. ANALYSIS

¶ 24    On appeal, respondent contends first that section 10 of the Act is facially unconstitutional. She relies primarily on *People v. Relerford*, 2017 IL 121094, which invalidated a superficially similar portion of the criminal stalking statute, section 12-7.3(a) of the Criminal Code of 2012

(Code) (720 ILCS 5/12-7.3(a) (West 2012)). For the following reasons, we hold that *Relerford* is distinguishable and that section 10 of the Act is not facially invalid.

¶ 25    We note that, although respondent did not raise this constitutional challenge in the trial court, she has not forfeited it. A facially unconstitutional statute is void *ab initio* and may be challenged at any time. *People v. Thompson*, 2015 IL 118151, ¶ 32. The constitutionality of a statute is a question of law to be reviewed *de novo*. *Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023, ¶ 22. However, the party challenging the statute must overcome a presumption of constitutionality. *Id.*

¶ 26    To explain why *Relerford* is distinguishable, we first compare the respective statutes. As pertinent here, section 12-7.3(a) of the Code stated that "[a] person commits stalking when he or she knowingly engages in a course of conduct directed at a specific person, and he or she knows or should know that this course of conduct would cause a reasonable person to *** suffer *** emotional distress." 720 ILCS 5/12-7.3(a)(2) (West 2020). The definition of "emotional distress" was similar to the definition used in section 10 of the Act. See *id*. § 12-7.3(c)(3), 740 ILCS 21/10 (West 2020).

¶ 27    Respondent is correct that, as pertinent here, section 10 of the Act and section 12-7.3(a) of the Code (struck down by *Relerford*) define "stalking" identically. However, although respondent contends that the invalidation of the latter on first-amendment grounds requires the invalidation of the former on the same grounds, she overlooks a crucial difference between the laws. Section 10 of the Act states, "Stalking does not include an exercise of the right to free speech or assembly that is otherwise lawful." 740 ILCS 21/10 (West 2020). By contrast, section 12-7.3(a) did not define "stalking" to exclude constitutionally protected speech. Instead, section 12-7.3(d) contained a separate set of "Exemptions" that provided, in pertinent part, "This Section does not apply to an

exercise of the right to free speech or assembly that is otherwise lawful." 720 ILCS 5/12-7.3(d) (West 2012). As we shall now explain, the difference is vital between (1) excluding constitutionally protected acts from the definition of "stalking" and (2) merely allowing first-amendment rights to be raised as an affirmative defense against a charge of stalking.

¶ 28    We now turn directly to *Relerford*. As pertinent here, the defendant was charged with stalking the complaining witness by telephoning her, sending her e-mails, standing outside her place of employment, and entering her place of employment. The charges alleged that he knew or should have known that his conduct would cause a reasonable person to suffer emotional distress. *Relerford*, 2017 IL 121094, ¶ 3. He was convicted and sentenced. The appellate court vacated the conviction (and three others) based on the statute's lack of an explicit mental state requirement. *People v. Relerford*, 2016 IL App (1st) 132531, ¶¶ 27, 31-33.

¶ 29    On appeal, the supreme court rejected the appellate court's reasoning (*Relerford*, 2017 IL 121094, ¶¶ 19-22). It then turned to the defendant's alternative argument that the statute was facially unconstitutional because it violated the free speech guarantees of the United States Constitution (U.S. Const., amend. I) and the Illinois Constitution (Ill. Const. 1970, art. I, § 4).

¶ 30    The court noted that, under section 12-7.3(a), "two or more nonconsensual communications to or about a person that the defendant knows or should know would cause a reasonable person to suffer emotional distress constitute *** stalking." *Relerford*, 2017 IL 121094, ¶ 29 (citing 720 ILCS 5/12-7.3(a), (c) (West 2012)). However, under the first amendment, "a government 'has no power to restrict expression because of its message, its ideas, its subjective matter, or its content.' " *Id.* ¶ 31 (quoting *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). As a result, content-based laws restricting speech are presumed to be invalid (*id.* ¶ 32), subject to a few exceptions, such as true threats and speech integral to criminal conduct. *Id.* ¶ 33.

¶ 31    The court then noted that section 12-7.3(a) of the Code, was content based.  The State contended that section 12-7.3(a) fell within the two exceptions just noted.  The court held otherwise: distressing communication, *per se*, was an independent ground for a conviction and need not either make a true threat (*id*. ¶¶ 37-39) or further or attempt criminal conduct (*id*. ¶ 45). Thus, the court turned to the defendant's contention that the statutory provision was void for overbreadth because of its potential to chill protected speech.  *Id*. ¶ 48.

¶ 32    As the court noted, a statute is facially overbroad "if it prohibits constitutionally protected activity as well as activity that may be prohibited without offending constitutional rights."  *Id*. ¶ 50.  A party may challenge a statute as prohibiting activities protected by the first amendment, even if her conduct is not so protected, given the importance of avoiding the potential chilling effect of overbroad statutes on protected speech.  *Id*.

¶ 33    The court then turned to the linchpin issue: whether section 12-7.3(a) was overbroad, *i.e.*, whether " ' "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." ' "  *Id*. ¶ 51 (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008))).  The court had no trouble with the answer: section 12-7.3(a) "embrace[d] a vast array of circumstances that limit speech far beyond the generally understood meaning of stalking."  *Id*. ¶ 52.  Many of these involved speech or communications that are protected by the first amendment, despite their potential to cause a reasonable person emotional distress; these included speech in a public forum about matters affecting the public welfare (*id*. ¶ 53-54) and even "core political speech" (*id*. ¶ 55.)  Moreover, no limiting construction of section 12-7.3(a) was possible.  *Id*. ¶¶ 57-61.

¶ 34    To rescue the provision, the State argued that the exemption in section 12-7.3(d)(2) corrected any constitutional defect in section 12-7.3(a).  The court disagreed:

> "[T]he exemption contains no language that would actually prevent the prosecution of charges based on protected speech.  Rather, the exemption is correctly viewed to function as an affirmative defense that must be raised by a defendant after a prosecution has been initiated.  As such, the exemption cannot eliminate the chilling effect on protected speech and resultant self-censorship."  *Id.* ¶ 61.

¶ 35    The court noted that because section 12-7.3(a) did nothing to distinguish between "distressing communications that [were] subject to prosecution and those that [were] not," section 12-7.3(d)(2) could not remedy "the extreme overbreadth of [section 12-7.3(a)]."  *Id.* ¶ 62.  Allowing prosecutors to decide this distinction case-by-case did not prevent "the chilling effect on innocent speakers who fear prosecution based on negligently made distressing communications to or about a person."  *Id.*

¶ 36    We return to the case at hand.  Under section 10 of the Act, the first amendment is not an affirmative defense that a respondent must raise after an action has been brought against her.  Instead, the lack of first amendment protection is an element of the cause of action that the petitioner must prove.  Unlike section 12-7.3(a) of the Code, section 10 of the Act defines stalking to include certain activities *and* exclude first-amendment activity.  Thus, the burden on a petitioner who seeks a stalking-no-contact order is to prove that the first amendment does not apply.  Does this distinguish the civil statute from the law struck down in *Relerford*?

¶ 37    *Respondent does not address this question*, because her brief does not recognize the distinction, we have noted between the two acts.  Given this default (and the excusable failure of

petitioner's *pro se* brief to address the issue meaningfully), we must tread carefully in deciding whether respondent has overcome the presumption that the Act is constitutional.

¶ 38    The case law does not address the issue before us squarely on similar facts.  Nonetheless, there is strong ground to conclude that the distinction between the criminal statute struck down in *Relerford,* and the Act is indeed crucial.  The overbreadth doctrine is intended to prevent the chilling of protected speech.  The case law emphasizes that the potential to chill protected speech is much greater when constitutional protection is a fact that a defendant must prove than when the lack of such protection is an element of an offense or a cause of action that the prosecutor or a civil petitioner must prove.

¶ 39    In *Free Speech Coalition*, 535 U.S. 234 at 255, the government argued that an anti child-pornography statute that had the potential to chill protected speech should survive an overbreadth challenge, because it allowed defendants to raise an affirmative defense that required proof, in essence, that the first amendment protected the materials at issue.  *Id*. at 255.  The Supreme Court disagreed:

> "The Government raises serious constitutional difficulties by seeking to impose on the defendant the burden of proving his speech is not unlawful.  An affirmative defense applies only after prosecution has begun, and the speaker must himself prove, on pain of a felony conviction, that his conduct falls within the affirmative defense."  *Id*.

¶ 40    In *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656 (2004), the Court considered whether a federal statute intended to protect minors by criminalizing certain types of Internet speech was void for overbreadth.  The Court noted, "Where a prosecution is a likely possibility, yet only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial."  *Id*. at 670-71.  And, as a state court has noted, "Application of the affirmative defense ***

on a case-by-case basis would require people of ordinary intelligence *** to be First Amendment scholars." *Long v. State*, 931 S.W.2d 285, 295 (Tex. Crim. App. 1996).

¶ 41    None of the foregoing opinions explicitly state that making the lack of constitutional protection an element of an offense (or a civil cause of action) would cure the inadequacy of allowing a defendant to raise constitutional protection as an affirmative defense. However, that inference is almost inescapable. Placing the burden of proof on the State deters the prosecution of speech that it cannot prove is outside the broad reach of the first amendment. But the defendant need not prove anything.

¶ 42    As respondent has simply neglected to contend that shifting the burden from the defendant to the plaintiff (here a civil one) does *not* rescue the Act from an overbreadth challenge, we shall not conclude that she has overcome the presumption that the challenged portion of the Act is constitutional. A facial challenge to the Act *as it is written* must await another day. We reject respondent's claim of facial unconstitutionality, such as it is.

¶ 43    Respondent argues second that, even if section 10 is not facially unconstitutional, it was applied unconstitutionally to the facts of this case. We need not address this contention, because we may reverse on a nonconstitutional ground—petitioner simply failed to prove her case. We adopt this approach because it is compelled by the law and because of the general rule that courts should decide cases on nonconstitutional grounds wherever possible. See *People v. Bass*, 2021 IL 125434, ¶ 30.

¶ 44    Moreover, there is no difference in substance between respondent's contention that the Act is unconstitutional as applied to her and our holding that petitioner failed to prove all of the elements of stalking. Respondent argues that, as applied, the Act is unconstitutional because the conduct that was the basis of the finding of stalking, was constitutionally protected. But, because

we have held that *constitutionally protected conduct is simply not stalking under the Act*, accepting respondent's premise implies not that the Act is unconstitutional as applied but that *the Act did not apply at all.* And we accept respondent's premise.

¶ 45    We note that, to obtain a stalking-no-contact order, a petitioner must prove by a preponderance of the evidence that the respondent engaged in conduct that constituted stalking. 740 ILCS 21/30(a) (West 2020); *McNally v. Bredemann*, 2015 IL App (1st) 134048, ¶ 10. A trial court's finding that a respondent committed stalking will not be reversed on appeal unless it is against the manifest weight of the evidence. *Id*. ¶ 12

¶ 46    Here, the trial court's finding that respondent committed stalking is against the manifest weight of the evidence.    Petitioner introduced no evidence that any of respondent's communications fell outside the protection of the first amendment.  Petitioner did not even argue that anything respondent said was either a true threat or integral to the commission of a crime (see *Relerford*, 2017 IL 121094, ¶ 33), but she relied entirely on the allegation that what respondent said would cause emotional distress to a reasonable person. The only suggestion of defamation was the unsupported assertion that some of what respondent said was false, but the trial court did not accept this assertion anyway[3]. The finding of stalking was against the manifest weight of the evidence.

---

[3]Indeed, the trial court failed to recognize that petitioner was required to prove that respondent's acts were unprotected by the first amendment. The court also explicitly stated that the Act prevailed over respondent's first-amendment rights. Thus, the judgment was based on insufficient evidence, a misreading of the Act, *and* a misunderstanding of the relationship between statutes and constitutions.

¶ 47    Respondent argues third that the injunction against her was an unconstitutional prior restraint. We do not address the constitutional issue. With no valid finding that respondent committed stalking, there was no basis for the stalking-no-contact order; *a fortiori*, there was no basis for the equally broad restriction on respondent's future speech. Thus, we reverse the injunction.

¶ 48    Although a remand for a new trial would theoretically be in order, we find compelling reasons to reverse the judgment outright. First, the failure of proof on a crucial element of petitioner's case was so complete that, in a jury trial setting, it would have warranted the grant of a judgment *n.o.v.*, either in the trial court or on appeal. See *Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992). Second, much time has passed since the conduct that led to this action. Giving petitioner a (theoretical) opportunity to obtain prospective relief based on conduct that occurred almost two years ago would violate judicial economy while in no way advancing justice.

¶ 49                              III. CONCLUSION

¶ 50    For the reasons stated, we reverse the judgment of the circuit court of Kendall County.

¶ 51    Reversed.