2025 IL App (2d) 240606-U
No. 2-24-0606
Order filed October 20, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-366 |
| KEVIN DEBOLT, | ) ) | Honorable Jody P. Gleason, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice Kennedy and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in denying defendant's postconviction petition following a third-stage evidentiary hearing because defendant failed to prove that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), and failed to establish that trial counsel rendered ineffective assistance.

¶ 2    Defendant, Kevin DeBolt, appeals the denial of his postconviction petition following a third-stage evidentiary hearing. On appeal, defendant argues that he was entitled to relief because the State improperly suppressed evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and, alternatively, he received ineffective assistance of counsel. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Our background discussion is focused on those facts relevant to defendant's postconviction petition. We will set forth sufficient facts for an understanding of the arguments raised in this appeal and include additional facts, as needed, in the analysis section of this disposition. However, further details of the underlying offense can be found in *People v. DeBolt*, 2022 IL App (2d) 200784-U (unpublished order under Supreme Court Rule 23 (eff. Jun. 3, 2025)). In fact, much of our background discussion is taken from that case.

¶ 5    In February 2018, defendant was indicted on two counts of aggravated criminal sexual assault alleging bodily harm (720 ILCS 5/11-1.30(a)(2) (West 2016)) and two counts of criminal sexual assault against a victim that was unable to give knowing consent (count 3) or unable to understand the nature of the act (count 4) (*id.* § 1.20(a)(2)). The charges were based on an incident that occurred on August 10, 2015, when the victim attended a cookout at the house of one of her neighbors and met defendant for the first time. At the time of the cookout, the victim lived in a two-bedroom condominium with her two daughters, 4-year-old A.V. and 13-year-old A.Z. It was undisputed that the victim and defendant had sex that evening that included sexual penetration. DNA analysis of the underwear the victim wore the day after the incident revealed two DNA sources, defendant's DNA and that of someone else who was unknown.

¶ 6    Prior to trial, the State filed a motion *in limine* arguing that evidence of the second DNA profile was barred by the rape shield law, section 115-7 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7 (West 2016)). Following a hearing on the motion, the trial court held that the second DNA profile would be admissible as a defense on the first two counts, to show that the alleged bodily harm (vaginal soreness) could have been caused by someone else. Thereafter, the State dismissed the first two counts and the trial court barred the evidence of the unidentified second DNA profile. Thus, the primary issue at trial was whether defendant knew or should have

known that the victim was unable to consent to the sexual penetration or to understand the nature of the act.

¶ 7     At trial, the victim testified that she went to a party at her neighbor's house on the night of the incident and had five or six alcoholic drinks over the course of four to six hours. At some point she felt sick and walked back home. She began vomiting and got into the shower. She testified that, at one point, defendant entered the shower with her while still clothed, twice telling her to suck his dick. However, no sexual penetration or oral sex occurred and defendant left the bathroom. The victim further testified that, after she showered, she put on pajamas and went to bed. The next thing she remembered was waking up at 6 a.m., naked, with both A.V. and defendant in bed with her. She did not recall inviting defendant into her bed and did not know why he was there.

¶ 8     The victim testified that she took a shower and got ready for work. After work, she went to the hospital, where a rape kit was administered. As noted above, DNA testing of the victim's underwear revealed two DNA sources, defendant's DNA and that of someone else that was unidentified. The victim testified that she did not give defendant consent to penetrate her or agree to have sexual relations of any kind.

¶ 9     When the victim testified about having vaginal soreness, the trial court found that this opened the door to the other DNA-evidence that was originally precluded under the rape shield law. The trial court thus permitted defense counsel to ask the victim if she had sex with anyone else that night. To that question, the victim testified that she did not remember how many people she had sex with that night; she did not remember having sex with anyone that night. She did not recall any males other than defendant coming to her house that night.

¶ 10    Defense counsel began to ask the victim about whether she was concerned that her daughter would tell her father that the victim and her four-year old daughter had woken up in bed with a strange man. The State objected, as this topic had been the subject of a motion *in limine* to bar evidence of the victim's child custody proceedings. Defense counsel was ultimately permitted to ask the question. The victim answered that she herself had told her daughter's father the night she spoke with the police. Defense counsel was not permitted to inquire any further about that.

¶ 11    On cross-examination, the victim admitted that her memory of that night was unclear. When she woke up the morning after the party, she went back to her neighbor's house to look for her phone. She had a conversation there with someone named Louis Galante, who she initially thought was the person in her bed when she woke up. Galante said that it was not him, and the victim asked him if he knew who it was.

¶ 12    The victim's neighbor testified that, when she finished cleaning up after the party, she went to the victim's house to check on her and she saw the victim and defendant sleeping in the victim's bed together. The victim's older daughter, A.Z., testified that defendant was at their house a couple times that evening. The first time he helped her bring the victim to the bathroom because the victim was vomiting and then he left. The second time, he came back because he had forgotten his drink and an envelope. He waited at the door, A.Z. brought him the items, and then he left. A.Z. went to bed about 20 minutes later. The next time she saw defendant was the next morning when he came out of the victim's bedroom.

¶ 13    Defendant testified that he and the victim met at the party and hung out together the rest of the night. At one point, she invited him to go home with her, saying that it was all right for him to stay at her place and that she could give him a ride home in the morning. At her home, the children were asleep, the younger one in the victim's bed and the older one in her own room. They

then went into the bathroom and had sex in the shower, during which he ejaculated into her vagina. After the shower, he and the victim went to sleep in her bed. He and the victim did not have sex in the victim's bed. The next morning, the victim got ready and drove him to his mother's house on her way to work.

¶ 14    Following closing arguments, the jury retired to deliberate. It was about 7 p.m. At about 11 p.m., the jury sent a note saying that they were deadlocked. The trial court sent a response, stating that the jury should continue to deliberate. The jury replied that they would come back the next day. During deliberations on the next day, the jury asked to see certain exhibits and transcripts. Finally, at some point in the afternoon, the jury acquitted defendant on count 4, but convicted him of count 3, which charged him with sexually penetrating the victim while knowing that she was unable to knowingly consent. Following the denial of his posttrial motions, defendant was sentenced to seven years' imprisonment.

¶ 15    On direct appeal, this court affirmed defendant's conviction and sentence. See *DeBolt*, 2022 IL App (2d) 200784-U. One of the issues raised on direct appeal was that the trial court erred in barring evidence of the second DNA profile found on the victim's underwear. Defendant argued that the other-DNA evidence would be relevant to show that the victim's genital soreness could have been caused by someone else, and that the person in the shower with her when she vomited could have been someone else, thereby lending credence to his assertion that he did not know she was intoxicated enough to be ill and vomiting. In rejecting this argument, we stated:

> "The trial court did not err in barring the defendant from presenting the other-DNA evidence. As the trial court and the parties discussed during the hearings on the defendant's multiple motions *in limine* on this subject, the other DNA could have been deposited in [the victim's] vagina up to 72 hours before it was collected, and so the mere presence of

that DNA could not establish whether [the victim] had sex with someone else on the night of the party. The trial court permitted the defendant to ask [the victim] whether she recalled having sex with anyone else that night, and [the victim] said she did not. As the other-DNA evidence was not directly relevant to any issue in the trial, its admission was not constitutionally required and the trial court did not abuse its discretion in excluding it." *Id.* ¶ 81.

¶ 16 On November 1, 2023, defendant, represented by counsel, filed an amended petition for postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). Defendant first argued that trial counsel was ineffective in failing to review DCFS documents that were provided by defendant's mother, which showed there was a DCFS investigation of the victim and a custody dispute over her younger daughter, A.V. Defendant alleged that the records showed, based on the events of the evening at issue, DCFS indicated the victim for neglect and she lost custody of her children. Further, the victim's actions were in violation of a joint parenting agreement with A.V.'s father, which precluded her from having overnight guests of a romantic nature, and consuming alcohol or drugs, while A.V. was residing with her. Defendant argued that these facts would have shown that the victim had a motive to characterize the sex as non-consensual, especially since she appealed the DCFS finding on the basis that she was a victim of a crime.

¶ 17 Defendant also argued that he was denied a fair trial because the State withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Defendant asserted that, since his trial, he discovered that the State had found a match to the unknown sample of DNA found on the victim's underwear and the match belonged to a man named Anthony Stulga, who was also being prosecuted for sexual abuse. Defendant alleged that Stulga committed a similar assault, which

involved performing a sex act in the presence of an unconscious victim where that victim's two daughters were in the home, at about the same time and in the same geographical area as the alleged sexual assault of the victim in this case. The State did not divulge this information to defense counsel. Defendant argued he was prejudiced because this information could have been used to advance a claim that defendant did not commit the sexual assault and the victim misidentified the perpetrator. In other words, that it was Stulga who sexually assaulted the victim in the shower or in her bed while she was sleeping. In support, defendant attached the affidavit of Dr. Karl Reich, who stated that he reviewed the forensic evidence in this case and it showed that the unidentified male DNA in defendant's case belonged to Stulga.

¶ 18    On November 16, 2023, the trial court docketed the amended petition for further consideration. See 725 ILCS 5/122-5 (West 2022). On December 18, 2023, the State filed a motion to dismiss defendant's petition. Following a hearing, the trial court denied the State's motion, noting its concern that the other DNA evidence was now identified, and set defendant's petition for an evidentiary hearing.

¶ 19    On May 1, 2024, defendant filed an emergency motion to continue the evidentiary hearing and for additional discovery. Postconviction counsel noted that Dr. Reich's affidavit indicated that there was a report which showed that Stulga's DNA was found on the victim's underwear but that, in preparing for the evidentiary hearing, counsel was unable to find such a report. Postconviction counsel reached out to Dr. Reich, who subsequently concluded that he misread the reports in this matter and that there was never a match between Stulga's DNA and the unidentified DNA sample in this case. Counsel asserted that, nonetheless, an Illinois State Police (ISP) laboratory report indicated that there was a directive for someone to compare Stulga's DNA to the unidentified sample in defendant's case. When postconviction counsel reached out to trial counsel,

Alison Motta, she stated she was unaware that there was ever a cross reference between the cases or that Stulga's DNA had been compared to the unidentified DNA sample in defendant's case. Counsel thus requested a continuance and for further discovery to obtain the results of any DNA comparisons conducted in defendant's case. Following a hearing, the trial court granted defendant's request for a continuance and for leave to issue a subpoena to ISP for all relevant DNA materials.

¶ 20  On June 25, 2024, the trial court provided both parties with copies of the DNA evidence in both defendant's and Stulga's cases, that were provided by ISP in each case as required by Illinois Supreme Court Rule 417 (eff. Mar. 1, 2001) (hereinafter "the Rule 417 packets"). The Rule 417 packets were admitted into evidence. Included in defendant's packet were two laboratory reports from Stulga's case, dated July 24 and December 27, 2017, which addressed analysis done on evidence in Stulga's case but which also included the following notation at the bottom of the report:

"cc: KENDALL CO SA

Laboratory Case File J15-006068 [defendant's ISP laboratory case number]"

Included in Stulga's file was an ISP "case scenario/information worksheet" that had a notation at the bottom to the effect of: "compare suspect standard to J15-006068 [defendant's ISP laboratory case number]."

¶ 21  On August 5, 2024, the trial court held an evidentiary hearing. Heather Wright confirmed that she had testified at defendant's trial as an expert in forensic biology and DNA analysis. She identified Exhibit A as the Rule 417 packet in this case and Exhibit B as the Rule 417 packet in the Stulga case. She testified that the DNA analysis conducted on the victim's underwear identified the victim's DNA and a mixture of two male DNA profiles. Defendant's DNA could not be excluded as a contributor. Wright further testified that the Stulga case occurred after

defendant's case. She explained that for pre-2018 cases, when cases were linked, reports from the subsequent case were placed in the administrative file for the previous case. The ISP went to a paperless system at the end of 2018. Wright acknowledged a notation in Stulga's file that said to compare the suspect standard to defendant's case but stated that the note was not her handwriting. She testified that she never did a direct comparison from the standard in the Stulga case to the unknown profile in defendant's case. Wright identified a December 27, 2017, laboratory report in Stulga's case which stated "cc: Kendall CO SA[,] Laboratory Case File J15-0006068 [defendant's ISP laboratory case number]." She did not know when that report was placed in defendant's file or who placed it there; she acknowledged that it could have been done at a later date.

¶ 22    On cross-examination, Wright confirmed that on April 11, 2018, the Kendall County State's Attorney's Office issued a subpoena for the Rule 417 packet in defendant's case. During that time, her office was transitioning from paper to electronic records and typically sent both paper and electronic copies of records. She also confirmed that two lab reports, dated July 24 and December 27, 2017, that were part of Stulga's case were also placed in defendant's case file. She acknowledged that the reports predated the April 2018 subpoena for defendant's Rule 417 packet and that her laboratory notes referenced defendant's file. She did not know when those reports were placed in defendant's file, but she had no reason to believe that they were not included in the Rule 417 packet provided in response to the April 2018 subpoena issued in defendant's case. Wright further testified that the reports would have been included in the initial Rule 417 packet submitted to the trial court and that they would have been stored in the administrative file for the case. She acknowledged that postconviction counsel never asked her to review the Rule 417 packet that was produced in April 2018.

¶ 23    Alison Motta testified that she and her husband represented defendant at trial. The State never indicated that there was a possible DNA link to another suspect. She had received the Rule 417 packet in defendant's case but the file did not contain any indication that the unknown male sample in defendant's case was compared to another person. She did not believe the July or December 2017 reports, mentioning Stulga, were included in defendant's pretrial Rule 417 packet. If they had been, she would have pursued the link and made further attempts to introduce the possibility of a second suspect at trial. The victim's daughter had described another person in the apartment that night possibly delivering mail. They thought the person was possibly another person at the party named "Tim," but he refused to have his DNA tested. If she had known that the State believed Stulga's DNA should be cross-referenced with defendant's case, she would have "delved into that" and raised it with the court.

¶ 24    As to the DCFS and custody proceedings, Motta testified DCFS found the victim not to be supervising her children during the evening at issue and she believed the DCFS records would be helpful to show motive or bias. She tried to subpoena records from DCFS but was told that no records existed. She also testified that she believed DCFS sent records to the trial court and she asked the trial court to do an *in camera* inspection of the records. Further, during trial, defendant's mother gave her information regarding a custody case involving the victim's children. Although Motta could not remember for sure, it was possible she asked the trial court to do an *in camera* inspection of some of the custody proceedings if some of the documents were under seal. She remembered a parenting agreement being at issue.

¶ 25    On cross-examination, Motta testified that perhaps the reason no DCFS records existed was because they were expunged when DCFS determined the allegations to be unfounded. She argued at trial that the DCFS case and the parenting agreement could be motive or bias for the

victim to testify falsely, but the trial court denied the request to admit evidence on these issues. She further testified that she did not specifically remember receiving defendant's Rule 417 packet. She would have reviewed it prior to trial, and if there was any mention of a correlation to Stulga, she would have noticed. She gave her entire trial file to postconviction counsel and that file should have included defendant's 417 packet. She did not review the packet prior to her postconviction testimony.

¶ 26    Motta acknowledged that the defense at trial was that the victim had consensual sex with defendant and that a second male profile would not relate to that defense. However, a second male could have done something that caused the victim to have a lack of memory, and it was possible that the victim thought she did not consent because she could not remember. Motta acknowledged that there was an order in defendant's case that indicated the Rule 417 packets were given to defendant and the State in court at trial on the same day. Motta believed it was a paper copy, but later testified that she was not sure if it was a paper copy or electronic. She was adamant that there was no mention of the Stulga case or a cross-reference to that case in defendant's 417 packet. If there was, she would have seen it and acted on it.

¶ 27    William V. testified that he and the victim had a child together, A.V. His name was on the witness list for defendant's case, but he was never called to testify. He did not remember if he was served a subpoena in defendant's case. In 2014, he and the victim reached a custody agreement that precluded either party from displaying immoral conduct or using drugs or alcohol while A.V. was in their care. After the events on August 10, 2015, he went back to court to have the agreement modified because there were allegations that A.V. was on the bed during the alleged sexual activity. The 2016 modified agreement required that the parties not consume alcohol, and the victim also not use any illegal drugs, 24 hours prior to or during their parenting time with A.V.

Additionally, neither party was to have any overnight guests of a romantic nature until they had been dating for at least a year.

¶ 28    After the defense rested, Wright testified for the State that, prior to her previous testimony, she had informed postconviction counsel that Stulga was not a match in the Combined DNA Index System (CODIS) to the unknown male DNA in defendant's case.  She acknowledged that Dr. Reich's report stated that there was an association between the two cases.  She stated that in reviewing the records in both cases, no forensic scientist could have concluded that there was a match.  There was absolutely no DNA evidence linking defendant's and Stulga's cases.  The fact that there was no CODIS match would have been known back in 2017 or 2018, whenever Stulga's case was completed and his DNA profile entered into CODIS.  There was never any forensic evidence that tied the cases together.  She completed a report dated August 15, 2024, that concluded that Stulga was excluded as a contributor to the unidentified profile in defendant's case, and the report was based on the CODIS analysis done in 2017.

¶ 29    On cross-examination, Wright explained that both defendant's and Stulga's cases included reports that each of their DNA profiles was entered into CODIS.  The fact that there was no report showing a match indicated that there was no CODIS hit between the two cases.  ISP did not issue reports when no associations were made, only when there was a match.

¶ 30    The trial court questioned Wright about a case correspondence in defendant's 417 packet that Wright completed.  It was dated November 12, 2019, and indicated Wright had a conversation with Motta.  Motta had left a voicemail message asking for information.  Wright called her back and told her a 417 packet had been provided.  Wright testified that, during that call, Motta confirmed that she received a 417 packet on a disk and asked her "if the information about the other case, case-to-case hit was provided."  Wright did not know anything about the other case,

but told her to issue a subpoena if she wanted information about another case. When questioned by postconviction counsel, Wright did not know for sure what case Motta was referring to and stated that she would have to review notes to determine if she was referring to another case involving a prior burglary by defendant. Wright stated that there was a CODIS hit between defendant's case and another case that was not Stulga's. The hit could have been from defendant's previous burglary case.

¶ 31 Thereafter, the State indicated it wanted to continue the hearing until Dr. Reich was available. After postconviction counsel withdrew Dr. Reich's affidavit, the State withdrew its request for a continuance and the parties proceeded to argument. Following argument, the trial court denied defendant's postconviction petition. The trial court found that there was no *Brady* violation because there was no CODIS hit and the State was not required to inform the defense of everyone in the State's system who was not a hit. The trial court also found that Motta received a 417 packet at trial and that it contained the reports referencing the Stulga case.

¶ 32 The trial court also found that trial counsel was not ineffective in failing to bring forth evidence of the victim's parenting agreement. The record showed that trial counsel spoke with the father of the victim's child about the parenting agreement, that there was a subpoena for him to testify, and that trial counsel ultimately did not call the father to testify. The trial court found that this was a matter of trial strategy. Further, the trial court found that it would not have allowed evidence of the parenting agreement at trial because it would not have been relevant to whether the sex was consensual. This timely appeal followed.

¶ 33                                    II. ANALYSIS

¶ 34 On appeal, defendant argues that the trial court erred in denying his postconviction petition. He contends that a *Brady* violation occurred because the State suppressed evidence regarding the

comparison to the Stulga case. According to defendant, the comparison was favorable and exculpatory, and he was prejudiced by its suppression because it could have been used to support a theory that someone else committed the crime. Defendant further argues that the trial court erred in rejecting his claim of ineffective assistance of counsel, asserting that counsel failed to follow up on the Stulga comparison and failed to present evidence of a custody agreement that would have provided the victim with a motive to testify falsely.

¶ 35    Under the Act, a defendant may mount a collateral attack on his conviction and sentence based on violations of his constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2022); *People v. Beaman*, 229 Ill. 2d 56, 71 (2008). To be entitled to postconviction relief, a defendant has the burden of making a substantial showing of a constitutional violation. *Id.* "Issues decided on direct appeal are barred by *res judicata*; issues that could have been raised, but were not, are forfeited." *Id.*

¶ 36    The Act provides a three-stage process for adjudicating postconviction petitions in noncapital cases. *Id.* In this case, defendant's amended postconviction petition advanced to a third-stage evidentiary hearing. See 725 ILCS 5/122-6 (West 2022). At the third stage, a defendant is entitled to a hearing where the trial court "may receive evidentiary proof via affidavits, depositions, testimony, or other evidence, and may order the petitioner brought before the court." *People v. Gerow*, 388 Ill. App. 3d 524, 527 (2009). "Following an evidentiary hearing where fact-finding and credibility determinations are involved, the trial court's decision will not be reversed unless it is manifestly erroneous." *Beaman*, 229 Ill. 2d at 72. A ruling is manifestly erroneous if it contains error that is clearly evident, plain, and indisputable. *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 3. However, if the trial court does not engage in fact-finding and credibility

determinations, no new evidence is provided, and the issues presented are purely questions of law, we will review the trial court's judgment *de novo*. *Beaman*, 229 Ill. 2d at 72.

¶ 37    In *Brady*, 373 U.S. 83, the United States Supreme Court held that a defendant's due process rights are violated when the State "suppresses or fails to disclose material exculpatory evidence." *Illinois v. Fisher*, 540 U.S. 544, 547 (2004) (describing the *Brady* rule). A "*Brady* claim" requires a showing that (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching, (2) the evidence was suppressed by the State either willfully or inadvertently, and (3) the accused was prejudiced because the evidence is material to guilt or punishment. *Beaman*, 229 Ill. 2d at 73-74. Offering an alternative suspect that shows someone else committed the charged offense could be considered favorable evidence. *Id.* at 75-76. However, when offering an alternative suspect, evidence cannot be "too remote or speculative." *Id.* at 75.

¶ 38    The materiality of the evidence is judged by a standard similar to that used in reviewing a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 694 (1984): evidence is material if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed, meaning that, had the evidence been introduced, it would have undermined confidence in the verdict. *United States v. Bagley*, 473 U.S. 667, 682 (1985). In determining whether evidence is material, courts must consider the cumulative effect of all the suppressed evidence, rather than considering each piece individually. *Beaman*, 229 Ill. 2d at 74. A *Brady* violation cannot be found harmless. *Id.*

¶ 39    In the present case, the trial court's determination that there was no *Brady* violation was not manifestly erroneous, as defendant failed to meet his burden of showing that the State suppressed any evidence. The trial court found that Motta received defendant's Rule 417 packet

in April 2018, prior to trial, and that the packet included the reports referencing the Stulga case. This conclusion was supported by the evidence. A court order dated April 27, 2018, specifically stated that the Rule 417 packet was provided to both parties in open court on that date. The Rule 417 packets admitted at the evidentiary hearing contained the forensic reports at issue, which cross-referenced defendant's and Stulga's cases. Further, Wright testified that, in a conversation with Motta prior to trial, Motta acknowledged receiving defendant's Rule 417 packet. Wright also testified that there was no reason to believe that the forensic reports at issue were excluded from that packet. Additionally, Wright testified that Stulga's DNA profile was entered into CODIS in 2017 or 2018, and that no match was generated between Stulga's and defendant's cases. Although Motta testified that the packet she received did not include the reports referencing the Stulga case, and that there was no indication the unidentified DNA in defendant's case had been compared to Stulga's DNA, it is the role of the trial court to assess witness credibility, determine the weight of the testimony, and resolve conflicts in the evidence. *People v. Domagala*, 2013 IL 113688, ¶ 34. We therefore defer to the trial court's decision to credit Wright's testimony over Motta's, and affirm its finding that the Rule 417 packets provided at trial included the reports at issue.

¶ 40 Defendant argues that the Rule 417 packet admitted at the evidentiary hearing was not the "original" packet that was tendered to him in open court prior to his trial. Although defendant could not locate his own copy of the original packet, he contends that the State possessed the original and failed to tender it to postconviction counsel. These arguments fail to recognize that it was defendant's burden to prove his claim of a *Brady* violation, not the State's burden to disprove it. *Beaman*, 229 Ill. 2d at 71. Wright testified that postconviction counsel never asked her to review the Rule 417 packet that was produced in April 2018. Moreover, defendant never subpoenaed the State's "original" version of the Rule 417 packet from 2018. For these reasons,

we affirm the trial court's finding that no evidence was suppressed, as the opposite conclusion is not clearly evident, plain, or indisputable.

¶ 41    Nonetheless, even if we assumed that the reports at issue were not included in the Rule 417 packets provided at defendant's trial, defendant failed to show that the evidence was favorable or material. The reference to Stulga was too remote and speculative to be favorable. While there was a note to compare Stulga's DNA to defendant's case, it was only a note, not an actual connection or forensic link from one case to the other. Wright testified that there was no CODIS match between the DNA profiles in defendant's case and Stulga's case at the time when Stulga's profile was entered into the CODIS database back in 2017 or 2018. Moreover, the reference to Stulga in defendant's Rule 417 packet is not exculpatory or material because defendant's trial strategy centered on a theory of consensual sexual contact with the victim, thereby removing identity as a contested issue. Thus, even assuming that defendant had been able to link Stulga to the third DNA profile, such evidence would not have supported his defense. It would not have negated the fact that defendant had sexual contact with the victim or proved that the victim consented to the contact. As the presence of an additional profile would not have advanced his claim of consent, it would not have been favorable or material to the theory presented at trial. In other words, there is no reasonable probability that the evidence linking his case to Stulga's would have changed the outcome at trial.

¶ 42    In arguing to the contrary, defendant relies on *Beaman*. In that case, the defendant was convicted of murdering a woman whom he had dated. *Beaman*, 229 Ill. 2d at 60. The defendant argued in his postconviction petition that the State had violated *Brady* by failing to disclose evidence that another man had also been a suspect. *Id.* at 66. An evidentiary hearing on the defendant's postconviction petition revealed that: the State had evidence that the other man

previously had a romantic relationship with the victim and told police that they planned to renew that relationship; he lived less than two miles from the victim's apartment; he had been previously charged with domestic battery of a girlfriend, who told the police that he acted erratically because he took steroids; and he admitted that he had supplied the victim with drugs and that she owed him money. *Id.* at 66-68. The appellate court affirmed the trial court's denial of the defendant's postconviction petition because the evidence pointing to the other man as a suspect was too remote and speculative to connect him to the murder. *Id.* at 69-70. Our supreme court, noting that the State's evidence against the defendant was "not particularly strong" (*id.* at 77), reversed and remanded for a new trial, stating:

> "[T]he evidence of [the other man] as an alternative suspect was crucial for petitioner because it countered the State's circumstantial evidence against him and rebutted the State's argument that all other potential suspects had established alibis. We conclude that there is a reasonable probability that the result of the trial would have been different if petitioner had presented the evidence establishing [the other man] as an alternative suspect. We cannot have confidence in the verdict finding petitioner guilty of this crime given the tenuous nature of the circumstantial evidence against him, along with the nondisclosure of critical evidence that would have countered the State's argument that all other potential suspects had been eliminated from consideration." *Id.* at 81.

¶ 43 *Beaman* is distinguishable from the present case. In *Beaman*, the identity of the perpetrator was in dispute and the State withheld evidence of an alternative suspect that had motive and opportunity to commit the crime. Unlike in *Beaman*, identity was not in dispute here. Defendant admitted to engaging in sexual intercourse with the victim; his defense at trial was that the contact was consensual. Whether the victim also had sex with another person that night does not prove

that the victim consented to the contact with defendant. The presence of a second DNA profile does not directly or indirectly support defendant's theory of consent. Moreover, at the time of trial, there was no CODIS match identifying Stulga as a possible contributor to the unidentified DNA profile. Given these significant factual differences, defendant's reliance on *Beaman* is misplaced.

¶ 44     In arguing that the alleged suppressed evidence amounted to a *Brady* violation, defendant also contends that the evidence would have weakened the State's case. Defendant notes that the State dismissed the charges for aggravated criminal sexual assault to avoid introducing the unidentified DNA sample into evidence, as its inclusion could have undermined the State's case by allowing defendant to question the origin of that DNA profile. Additionally, defendant notes that the victim testified that she initially believed Galante was in bed with her the morning after the incident, and only realized it was defendant when she went to Newcomer's and Galante told her so. Defendant further argues that the suppressed evidence would have bolstered an argument that the police investigation was insufficient because they did not test the victim's bedding and, despite factual similarities between the offenses, did not conduct a direct comparison of Stulga's DNA to the unidentified profile in this case.

¶ 45     These arguments are unpersuasive. Even without the alleged withheld evidence, defendant was able to challenge the victim's inability to immediately identify him upon waking the morning after the party, and he cross-examined her regarding the inconsistencies between her trial testimony and her statements to the police. Additionally, the victim testified at trial that she did not remember how many people she had sex with that night and did not remember having sex with anyone at all. As this court held in defendant's direct appeal, the other-DNA evidence was not directly relevant to whether defendant knew the victim could consent, as "whether she also had

sex with someone else has no bearing on whether she consented to have sex with [defendant] or whether [defendant] knew she could not consent." *DeBolt*, 2022 IL App (2d) 200784-U, ¶ 80. Accordingly, the dismissal of defendant's *Brady* claim was also proper because the allegedly withheld evidence was neither exculpatory nor material.

¶ 46    Alternatively, defendant argues that the trial court erred in not granting his postconviction petition on the basis of ineffective assistance of counsel. Defendant notes that the jury sent out several notes during deliberation and, at one point, indicated that they were deadlocked. Defendant argues that this was the type of case where an attorney's deficient performance would influence the jury's ultimate verdict. Defendant asserts that trial counsel was ineffective in overlooking the information in defendant's Rule 417 packet related to Stulga and in failing to bring forth evidence at trial about the victim's motive to lie because of the custody dispute between her and William V. over her youngest daughter, A.V.

¶ 47    Under the two-prong test developed in *Strickland v. Washington*, 466 U.S. 668 (1984), to prevail on a claim of constitutionally ineffective assistance of counsel, "a defendant must show that (1) his counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defendant in that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Houston*, 226 Ill. 2d 135, 144 (2007). Regarding the first prong, there is a strong presumption that counsel's actions or inactions—such as the decision not to present certain arguments, or not to call witnesses, including the client herself—constitute sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). To prove otherwise, a party must show that counsel's decision was so irrational and unreasonable that no reasonably effective attorney, facing similar circumstances, would pursue such a strategy. *People v. Jones*, 2012 IL

App (2d) 110346, ¶ 82. Because a defendant must satisfy both prongs of the *Strickland* test, the failure to establish either is fatal to the claim. *Strickland*, 466 U.S. at 687.

¶ 48 Defendant's argument that defense counsel was ineffective for failing to notice the references to the Stulga case in his Rule 417 packet, and pursue Stulga as the possible unidentified DNA profile, is without merit. As we have determined that the alleged evidence was neither favorable nor material, there was no prejudice. See *People v. Goldsmith*, 259 Ill. App. 3d 878, 889 (1994) (holding that where the alleged improperly suppressed evidence would not have altered the outcome at trial, defense counsel's failure to present that evidence cannot establish ineffective assistance of counsel). In the absence of prejudice, defendant's claim of ineffective assistance of counsel on this basis necessarily fails. *Strickland*, 466 U.S. at 687.

¶ 49 Defendant's argument asserting ineffective assistance of counsel for failing to present evidence of an alleged custody dispute at trial is also unavailing. Motta testified at the evidentiary hearing that she did, in fact, attempt to introduce this evidence. Specifically, Motta testified that, at trial, she argued that the parenting agreement could demonstrate motive or bias for the victim to testify falsely but that the trial court denied the request to admit such evidence. The record supports this assertion. Prior to trial, the State filed a motion *in limine* to exclude evidence of any custody issues, arguing that it was irrelevant, particularly because the victim reported the sexual assault before her child's father became aware of the incident. The State further asserted that if the defense pursued this line of questioning, it would establish that the victim never lost custody of her children.

¶ 50 At a hearing on the motion *in limine*, Motta argued that the evidence was relevant because the incident—involving the victim becoming so intoxicated that a man ended up in bed with her and her four-year-old daughter A.V.—posed an obvious risk of affecting custody and visitation.

Motta argued that she did not even need to call A.V.'s father to testify because the motive to lie was apparent. She argued that she should be able to cross-examine the victim about whether she was concerned that, once the incident became known, it could lead to custody-related consequences, and that the victim went to the police to shift the blame off herself by framing it as nonconsensual. The trial court ultimately granted the State's motion, allowing defense counsel to question the victim about whether she was worried about the fathers of her children learning about the incident, but precluding any questions specifically related to a custody dispute.

¶ 51  Based on the foregoing, defendant's argument that trial counsel was ineffective for failing to raise the custody issue at trial is without merit. There was no deficient performance because trial counsel did, in fact, seek to raise the custody issue and question the victim about it, but the trial court denied that request. Furthermore, at trial, defense counsel did question the victim about whether she was concerned that her daughter would tell her father that the victim and the four-year old daughter had woken up in bed with a strange man. The victim testified that she told her daughter's father on the night she spoke with the police. See *DeBolt*, 2022 IL App (2d) 200784-U, ¶ 14. Moreover, we note that defendant had the opportunity to argue on direct appeal that the trial court erred in granting the State's motion *in limine* barring evidence of any custody issues, but failed to do so.

¶ 52                               III. CONCLUSION

¶ 53  For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 54  Affirmed.